# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 11, 2001 Session

## STATE OF TENNESSEE v. JIMMY M. MILLICAN

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2000-T-181    J. Randall Wyatt, Jr. , Judge**

---

**No. M2000-02298-CCA-R3-CD - Filed January 31, 2002**

---

A Davidson County jury convicted the defendant of aggravated vehicular homicide and driving on a revoked license.  He was sentenced to 25 years for aggravated vehicular homicide and a concurrent six months for driving on a revoked license.  The defendant contends in this appeal that (1) the evidence was not sufficient to support his convictions; (2) a facially invalid judgment for a prior DUI conviction was used to enhance his conviction to aggravated vehicular homicide; and (3) his sentence is excessive.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOE G. RILEY, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and JOHN EVERETT WILLIAMS, JJ., joined.

Ross E. Alderman, Public Defender; and Jeffrey A. DeVasher (on appeal), Hollis I. Moore, Jr. (at trial), and Wendy S. Tucker (at trial), Assistant Public Defenders, for the appellant, Jimmy M. Millican.

Paul G. Summers, Attorney General and Reporter; Thomas E. Williams, III, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and James D. Sledge and James Todd, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

According to the state's proof, on the evening of March 3, 1999, a van driven by the severely inebriated defendant crashed into victim Alex Haught's car at the intersection of 20th Avenue and West End Avenue in Nashville and then plowed into Amerigo's Restaurant.  Haught died shortly after the accident.

Kym Murphy, a business executive visiting in Nashville, was walking on West End toward Amerigo's Restaurant.  As he prepared to cross the street at the intersection, he heard a vehicle

accelerate. He testified he believed the van was traveling on 20th Avenue, and further testified the van was traveling at a high rate of speed as it approached the intersection. He stated Haught's car was traveling on West End toward the intersection. Murphy testified he was positive Haught's car had the green light. He said he saw the van cross through the intersection, swerve slightly, and strike the car on the driver's side before the van ricocheted toward the restaurant. Murphy testified he did not see anyone flee the van, and he saw the valet and others approach the van. Murphy stated he first went to assist the victim. After the paramedics arrived, he walked past the van where he observed the defendant sitting in the driver's seat, leaning forward.

Patrick Winningham, the valet at Amerigo's Restaurant, testified he was standing outside the restaurant when he heard a loud crash and saw the vehicles collide. Winningham stated he could see two Caucasian men inside the van as it careened towards him, forcing him to move out of the way before it struck the restaurant, knocking out a glass window, and imbedding itself in the bar area near the restaurant's entrance. Winningham testified he opened the van's passenger door and saw two Caucasian men inside the van. He stated the van's other doors were not open at that time. According to Winningham, the defendant was in the driver's seat, leaned over the van's console, with his feet underneath the steering wheel. Winningham observed the unconscious passenger leaned over the dash. It was apparent the passenger had struck his head on the passenger side of the windshield. Winningham saw a whiskey bottle in the floorboard of the van. Winningham denied seeing a third person running from the scene.

David Conn, regional manager for Amerigo's Restaurant, testified he was standing near the front door of the restaurant when he heard a loud explosion. Conn said he was outside the restaurant in less than a minute, where he was one of the first people to reach the van. Conn said a liquor bottle fell out of the van when the passenger door was opened. He saw two Caucasian men inside of the van; the defendant, who was in the area of the driver's seat, and the passenger, who was bleeding from the forehead. He testified that a short time later, an apparently "homeless" African-American man approached the van from the rear. Conn said the man may have been trying to get in the van, but disappeared after someone asked him to step away. The man did not appear to have been injured.

Chris Jacobs, the restaurant's manager, testified the van plowed into the bar area of the restaurant near the front door. Jacobs saw the van enter the building about six feet from where he was standing. Jacobs saw two dazed men in the van.

Michael Parish was eating at Amerigo's Restaurant when he heard a crash and then heard heavy plate glass breaking. He immediately arose from his table and, within ten seconds, walked out the front door of the restaurant to the van. He saw the defendant in the driver's seat area. Parish said the defendant's feet were in the area of the pedals and his buttocks were not completely on the driver's seat. He testified the defendant babbled and smelled of alcohol. According to Parish, the defendant repeatedly said, "I've done something terribly wrong. I've got to get out of here." Parish described the defendant as belligerent. He stated the defendant fought an EMT and cursed.

Jeff Boggs, a former EMT, was in the restaurant when he heard the crash and made his way out to the van. After others removed the passenger from the van, he entered it through the passenger door to tend to the defendant, whom Boggs said was on the floor between the seats. He stated the defendant smelled of alcohol. Boggs said he heard the defendant say, "I've made a big mistake. I'm really sorry." Boggs testified that a very animated and very pushy African-American man "came out of nowhere" and urged those standing around the van to remove its occupants because the van might catch fire. Boggs stated he fended the man off and watched the man walk away. Boggs said the man did not appear to be suffering from any injury.

Officer Philip Vincion testified his reconstruction of the accident showed the van was traveling east on West End as Haught turned left, or west, onto West End from northbound 20th Avenue. Vincion opined the crash was caused when the van failed to stop for a red light and struck Haught's car, which according to witnesses' statements, had a green light. Vincion testified there was a fluid and debris trail from the van, beginning at the point of impact in the intersection and ending where the van struck the restaurant. He stated the physical evidence indicated the van did not apply its brakes before impact.

Vincion testified the van's passenger struck his head and cracked the van's windshield on the passenger side, lacerating the passenger's forehead. A toxicologist testified DNA tests showed the passenger's hair and blood were found in the cracks in the windshield. Vincion stated he observed the defendant in the van after the passenger was placed on a stretcher. He said the defendant was sitting upright on the floor between the seats with his legs wedged between the driver's seat and the area below the steering column. Vincion testified there was a strong odor of alcohol coming from the defendant, who had bloodshot eyes and slurred speech. Vincion stated the defendant told him, "F-ck you. I wasn't driving. Why don't you just go ahead and whip my f-cking -ss. Get the light of out my face, you god–mn motherf-cker." Vincion said the defendant had no visible injuries.

Officer Mack Peebles testified he was dispatched to the accident and observed the defendant sitting in the driver's seat, leaning across the gap between the seats. Officer Chris Hendry testified the defendant was laying between the front seats with his feet between the van's console and the pedals.

Sgt. David Woods testified the defendant, who reeked of alcohol, was very combative and cursed medical personnel. As Woods was attempting to restrain the defendant, he found an empty whiskey bottle in the defendant's coat pocket. Johnny Ghee, a paramedic for the Nashville Fire Department, testified he observed the defendant sitting between the van's console and driver's seat with his feet on the floorwall near the accelerator and pedal area.

Paramedic Cary Arnes testified the defendant was sitting in the van's driver's seat, slumped toward the console, with his legs on both sides of the console. Arnes said the defendant, who smelled of alcohol, cursed and tried to strike his partner.

Officer Wallace Taylor testified the victim, Alex Haught, was pronounced dead at the hospital. Dr. Bruce Levy, the medical examiner, testified Haught died as a result of injuries he received in the collision.

The parties stipulated the defendant's driver's license was revoked at the date of the collision. Blood tests indicated the defendant had a blood alcohol level of .34%.

Lori Roberts, an R.N. who was dining at Amerigo's Restaurant at the time of the collision, testified for the defendant that when she exited the restaurant after the van struck the building, she asked the valet how many people were in the van. Roberts stated the valet replied there were three. Roberts said she then asked him where the third person was and he responded, "He took off." Roberts testified she observed the driver's door was slightly open. She stated she saw the defendant in the floor between the front and back seats with his legs stretched forward against the console. She said the defendant was belligerent, violent, and "very intoxicated." Roberts said the defendant admitted he had been drinking, but denied driving. Roberts testified that as she exited the van after checking the defendant, she said she found a man's slip-on brown loafer on the ground. Its mate was found on the other side of the van. Roberts stated the defendant and the passenger were wearing both of their shoes.

Patrick Winningham, the valet, was recalled and testified he did not see a third person running away from the van. He explained he may have repeated what another person told him. Winningham stated he saw only two Caucasian men in the front of the van.

Vivian French testified for the defendant that she was in the restaurant and saw two Caucasians in the van before it crashed into the restaurant. French said she was delayed from exiting the restaurant and when she reached the outside, she saw an African-American man wearing a ski cap and baggy clothes stepping out of the van as if he had been the driver. French stated the man looked over his shoulders and ran past her.

Based on this evidence, the jury found the defendant guilty of vehicular homicide and driving on a revoked license. At the second phase of the bifurcated trial, the jury further found the defendant had a prior conviction for driving under the influence of an intoxicant and, at the time of the present offense, had .20% or more blood alcohol content. *See* Tenn. Code Ann. § 39-13-218(a)(3)(A). Therefore, the jury enhanced the conviction to aggravated vehicular homicide, a Class A felony. *See id.* The trial court sentenced the defendant, a Range I standard offender, to the maximum sentence of 25 years for aggravated vehicular homicide and a concurrent sentence of six months for driving on a revoked license.


## SUFFICIENCY OF THE EVIDENCE

The defendant argues the evidence was not sufficient to support his convictions. There are two prongs to his argument. First, he contends there was reasonable doubt as to whether he was the driver of the van based on the evidence at trial concerning the apparently "homeless" African-

American man seen near the van following the accident. Second, he submits the "physical facts rule" negates the jury's finding that his intoxication was the proximate cause of the victim's death. We are unable to agree with either claim.

In Tennessee, great weight is given to the result reached by the jury in a criminal trial. A jury verdict accredits the state's witnesses and resolves all conflicts in favor of the state. State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. *Id.*; State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).

Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

### A. Identity of the Driver

As to the defendant's argument the evidence was not sufficient to establish beyond a reasonable doubt that he was the driver, the testimony of numerous witnesses who reached the van within seconds following the collision indicated the defendant was sitting in the driver's seat; there were only two men in the van; and no one else exited the van. Kym Murphy, who witnessed the collision, testified he did not see anyone flee from the van, and he saw other people, including the valet, approach the van immediately after it struck the building. Patrick Winningham, the valet, testified he saw only two Caucasian men inside the van just before it hit the building. Winningham also stated these two men were the only ones in the van when he opened the passenger door right after the crash. According to Winningham, the defendant was in the driver's seat with his feet under the steering wheel. David Conn and Chris Jacobs both testified they exited the restaurant seconds after the van plowed through the window and saw only two men in the van. Conn stated the defendant was in the area of the driver's seat. Michael Parish also observed the defendant in the driver's seat with his feet near the pedals. Officer Mack Peebles and paramedic Cary Arnes said the defendant was sitting in the driver's seat. Officer Philip Vincion testified the defendant's legs were wedged between the driver's seat and area beneath the steering column, though he was sitting on the floor between the seats. Viewing the evidence in a light most favorable to the state, this evidence was more than sufficient to support the jury's finding that the defendant was driving the van.

### B. Physical Facts Rule

The defendant also contends eyewitness Kym Murphy's testimony that defendant's van was on 20th Avenue and the victim's car was on West End conflicts with the physical evidence; therefore, the physical facts rule requires Murphy's testimony as to those facts be disregarded. *See* State v.

Hornsby, 858 S.W.2d 892 (Tenn. 1993). In Hornsby, our state supreme court held the physical facts rule, which allows the courts to disregard a witness's testimony where the testimony is entirely irreconcilable with the physical evidence, is applicable in criminal cases. *Id*. at 894-95. However, the court cautioned that the power to disregard testimony should be used sparingly, "[o]nly when testimony is inherently improbable and impossible of belief." *Id*. at 895. It instructed that the matter should be left to the jury when the testimony is capable of different interpretations because it is within the province of the jury to decide whether there are inconsistencies in testimony, to reconcile conflicts in testimony, and to determine the credibility of witnesses. *Id*. at 895.

Just as the court in Hornsby, we too are reluctant to apply the physical facts rule in this case. We note the defendant is asking this court to disregard Murphy's testimony that placed the defendant's van on 20th Avenue, yet give credit to his testimony that the vehicle on West End had the green light. We are unable to do so without invading the province of the jury. Murphy emphatically stated that the victim's car, and not the defendant's van, had the green light. If he did reflect on the diagram the wrong location of the vehicles, that does not entitle this court to conclude as a matter of law that the defendant's van had the green light.[1]

Even if we were to hold Kym Murphy's testimony must be disregarded under the physical facts rule, Officer Vincion's testimony would still have provided a sufficient basis for the jury's finding that the defendant's intoxication was the proximate cause of the victim's death. Officer Vincion had experience and special training in accident investigation. He testified that his investigation revealed that the driver of the van was on West End and never applied his brakes. The transcript also reveals the following:

> **Prosecutor**: Based on your investigation, your interviews, the damage to the vehicle and the evidence you collected at the scene, were you able to determine the proximate cause of that deadly crash out there that night?

> **Officer Vincion**: The cause of the crash was the driver of the van not stopping for the red light, based on statements from witnesses that I interviewed, and crashing into the Haught vehicle, which, again, by witnesses' statements have [sic] the green light coming north on 20th, across West End.

This testimony, admitted without objection, clearly presented a jury question as to whether the defendant's intoxication was the proximate cause of the victim's death. *See* State v. Farner, ___ S.W.3d ___, ___, 2001 WL 1575024, at *12 (Tenn. Dec. 11, 2001, at Knoxville) (holding causation is generally a question of fact for a properly instructed jury).

---

[1]We also note that the diagrams introduced were very confusing. The diagrams were drawn with the west facing the top of the page where one would ordinarily expect to find north. In several instances, witnesses referred to the diagrams as they testified; however, the record does not clearly convey all of their testimony as to the location of vehicles, people, or other objects on the diagrams.

The trial court instructed the jury that " '[p]roximate result' is defined to mean a result, which in a natural and continuous sequence, is a product of an act occurring or concurring with another, which, had it not happened, the result would not have occurred." *See* T.P.I - CRIM. 7.08(b) (5th ed. 2000). The jury, as was its prerogative, concluded the victim's death was the "proximate result" of the defendant's intoxication. *See* Tenn. Code Ann. § 39-13-213(a)(2); Farner, ___ S.W.3d at ___, 2001 WL 1575024, at *12 (holding "a victim's contributory negligence [in a criminally negligent homicide case] is not a complete defense but may be considered in determining whether or not the defendant's conduct was a proximate cause of death"). Viewing the evidence in a light most favorable to the state, as we must, the evidence supports the verdict.


## FACIAL VALIDITY OF PRIOR CONVICTION

The defendant also argues the prior DUI judgment of conviction, which was used to enhance his vehicular homicide conviction to aggravated vehicular homicide at the second phase of his bifurcated trial, was facially invalid and inadmissible. He bases this argument on two facts: (1) the judge's signature appears just below the signature line on the judgment, underneath two notes regarding forfeiture of the defendant's bail bond; and (2) the date of disposition does not appear on the judgment. We respectfully disagree.

After the jury convicted the defendant of vehicular homicide and driving on a revoked license, the state presented the testimony of Giles County Circuit Court employee Crystal Greene. Greene identified a certified copy of a Giles County General Sessions Court warrant charging the defendant with driving under the influence on March 25, 1986. Greene also identified the signature of the general sessions court judge. It was located just below the line for the judge's signature in the judgment section for the warrant, and the judgment form indicated the defendant pled guilty to DUI, was sentenced to serve two days in the county jail, and was fined $250. Just above the judge's signature were notes indicating there had been a conditional forfeiture on April 10, 1986, and a final forfeiture on October 10, 1986, of the defendant's bail bond. There were lines drawn through these notations and dates regarding the forfeitures. There was no date of final disposition reflected on the DUI judgment. Greene testified, however, that she prepared an abstract of the judgment to send to the Department of Safety on June 14, 1990, the day the judgment was entered, as was the usual procedure in the Giles County Circuit Court Clerk's office. Defense counsel cross-examined Greene regarding the location of the judge's signature and the lack of the date of disposition on the judgment itself. As stated, the jury returned a guilty verdict for the enhanced offense of aggravated vehicular homicide.

This court has held that an unsigned general sessions court judgment is void and cannot be used as proof of a prior conviction for enhancement purposes. State v. McJunkin, 815 S.W.2d 542, 543 (Tenn. Crim. App. 1991). After reviewing the judgment portion of the certified copy of the general sessions court warrant charging the defendant with DUI, we concur with the trial court that the judgment was not facially invalid for lack of a judge's signature. The judge signed his name directly underneath the line intended for his signature and, while it is also underneath the court's

notes regarding the forfeiture of the defendant's bail bond, the notes regarding the forfeitures were crossed out. We conclude, therefore, there was sufficient proof that the judge's signature related to the judgment of conviction. This, along with Greene's testimony that the judgment of conviction was rendered on June 14, 1990, was sufficient to support the jury's finding that the defendant had a prior DUI conviction. Furthermore, the omission of the date on a general sessions court judgment does not void it. State v. Tipton, 13 S.W.3d 397, 401 (Tenn. Crim. App. 1999). This issue has no merit.

## SENTENCING

The defendant argues the trial court erred in sentencing him to the maximum 25-year Range I standard offender sentence for the Class A felony, aggravated vehicular homicide. The probation officer who prepared the presentence report testified the defendant had 98 prior misdemeanor arrests between 1976 and 1999. Of these arrests, she was able to confirm 20 prior convictions, the most recent being a conviction for criminal trespassing on March 1, 1999. The remainder of the charges were either dismissed, retired, or the probation officer was unable to determine their disposition. The defendant had been charged 13 times for failing to appear. There was no proof of the number of convictions resulting from these charges.

The trial court considered enhancement factors (1) (defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range), (8) (defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release into the community), (9) (defendant possessed or employed a deadly weapon during the commission of the offense), and (10) (defendant had no hesitation about committing a crime when the risk to human life was high). Tenn. Code Ann. § 40-35-114(1), (8), (9), (10). The defendant maintains the lower court erred in applying enhancement factors (8), (9), and (10).

The trial court declined to give any weight to mitigating factors. *See* Tenn. Code Ann. § 40-35-113. Defendant contends the trial court erred in not mitigating the sentence based upon his favorable institutional record while incarcerated in this case.

## A. Standard of Review

This court's review of the sentence imposed by the trial court is *de novo* with a presumption of correctness. Tenn. Code Ann. § 40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543 (Tenn. 1999). If the trial court fails to comply with the statutory directives, there is no presumption of correctness and our review is *de novo*. State v. Poole, 945 S.W.2d 93, 96 (Tenn. 1997).

If no mitigating or enhancement factors for sentencing are present, Tenn. Code Ann. § 40-35-210(c) provides that the presumptive sentence for a Class A felony shall be the midpoint within the range; namely, 20 years. *See* Tenn. Code Ann. § 40-35-112(a)(1). However, if such factors do exist, a trial court should enhance the presumptive sentence within the range for enhancement factors and then reduce the sentence within the range for the mitigating factors. Tenn. Code Ann. § 40-35-210(e); State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). No particular weight for each factor is prescribed by the statute, as the weight given to each factor is left to the discretion of the trial court as long as the trial court complies with the purposes and principles of the sentencing act and its findings are supported by the record. State v. Moss, 727 S.W.2d 229, 238 (Tenn. 1986); State v. Kelley, 34 S.W.3d 471, 479 (Tenn. Crim. App. 2000); *see* Tenn. Code Ann. § 40-35-210 Sentencing Commission Comments.

## B. Analysis

The trial court properly applied enhancement factor (1) based upon the defendant's 20 prior misdemeanor convictions. *See* Tenn. Code Ann. § 40-35-114(1). The defendant does not contest this factor.

The trial court applied enhancement factor (8) (previous history of unwillingness to comply with conditions of sentence involving release into community) for failing to appear in court on numerous occasions. However, this factor does not apply since the alleged failures to appear were not "conditions of a sentence" involving release. *See* Tenn. Code Ann. § 40-35-114(8) (emphasis added); State v. Richard Ricardo King, CCA No. 01C01-9603-CR-00113, 1997 WL 71837, at *2 (Tenn. Crim. App. Feb. 20, 1997, at Nashville). Nevertheless, the presentence report indicates that on February 22, 1998, defendant was arrested for disorderly conduct; defendant was found guilty of the offense on February 23, 1998, and sentenced to 30 days; and committed a criminal trespass on March 4, 1998, for which he was convicted on March 10, 1998. This justifies application of this enhancement factor.

The trial court's application of enhancement factor (9) (defendant possessed or employed a deadly weapon during the commission of the offense) was based on the vehicle being a deadly weapon. *See* Tenn. Code Ann. § 39-11-106(a)(5)(B). However, the operation of a vehicle is a necessary element of aggravated vehicular homicide. *See* Tenn. Code Ann. §§ 39-13-213, -218. Therefore, we conclude the trial court erred in using it to enhance the defendant's conviction.

Enhancement factor (10) (defendant had no hesitation about committing a crime when risk to human life was high) can only be applied to homicide offenses if the proof established the defendant created a high risk of life to a person other than the victim. State v. Bingham, 910 S.W.2d 448, 453 (Tenn. Crim. App. 1995); State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995). The defendant argues this factor is not applicable to his sentence because Kym Murphy testified at trial there was little traffic in the vicinity at the time of the collision. However, the proof at trial established the defendant's conduct endangered others beside the victim. The defendant's passenger was injured. Patrick Winningham, the valet, had to move from his position in front of the restaurant to avoid being struck by the van before it crashed into the restaurant. The restaurant manager

testified the van came to rest inside the restaurant, a mere six feet from where he was standing. The defendant's conduct created a great risk of death to many persons, including those inside the restaurant. This factor was properly applied.

Defendant contends the trial court erred in failing to consider defendant's favorable institutional record since his arrest. *See* Tenn. Code Ann. § 40-35-113(13). The presentence report indicated the defendant said he had been unjustly convicted; he had been "used;" and "they didn't even look for anybody else." The trial court found "very little mitigation in this case." The trial court further noted that defendant had not exhibited any remorse at all. We are unable to conclude the trial court erred in not reducing the sentence because of defendant's favorable institutional behavior.

Although the trial court misapplied enhancement factor (9), we conclude, based upon our *de novo* review, that the remaining enhancement factors and absence of any significant mitigating evidence justify the enhancement of the defendant's sentence as ordered by the trial court. Therefore, we will not disturb the sentence imposed by the trial court.

## CONCLUSION

Accordingly, we affirm the judgment of the trial court.

_____
JOE G. RILEY, JUDGE

-10-