STATE of Tennessee, Appellee,

v.

Ovid C. ABRAMS, Appellant.

No. 02-S-01-9509-CC-00085.

Supreme Court of Tennessee,
at Jackson.

Nov. 12, 1996.

Ron E. Harmon, Savannah, for Appellant.

Charles W. Burson, Attorney General and
Reporter, Michael E. Moore, Solicitor General, Gordon W. Smith, Associate Solicitor
General, Nashville, John W. Overton, Jr., Assistant District Attorney, Savannah, for Appellee.

## OPINION

BIRCH, Chief Justice.

Ovid C. Abrams, the defendant, appeals
the judgment of the Court of Criminal Appeals affirming his first-degree murder conviction.[1] The State did not seek the death
penalty, and Abrams received a sentence of
life imprisonment. In his appeal, Abrams
contends that the evidence adduced against
him was insufficient to establish the elements
of premeditation and deliberation necessary
to sustain a conviction of first-degree murder. We affirm.

### I

On June 10, 1993, just after dinner,
Abrams killed his 94-year-old mother by
striking her twice on the head with a wooden
maul.[2]

At trial, Nadene Abrams recounted the
events of the day:

At twelve or after lunch that day, we had
finished eating and I was washing the
dishes and just all of sudden he comes
dashing in the house with a big hickory
stick and said, "What do you people
have"—said, "Somebody's been up here all
day trying to figure out some things," or
something. And he was just furious and
my mother and I just began talking to him
and told him nobody had been in and he
just turned and walked out as calm as
everything.... He said we had had some-

---

1. The defendant was convicted pursuant to Tenn.
Code Ann. § 39-13-202(a)(1) (1991) which defines first-degree murder as "[a]n intentional,
premeditated and deliberate killing of another...." In 1995, the legislature amended this
statute to define the offense as "[a] premeditated

and intentional killing of another...." 1995
Tenn.Pub.Acts, ch. 460 § 1 (effective July 1,
1995).

2. A heavy, long-handled hammer.

body up there or some kind of machine trying to figure out some things he was doing.

Sometime in the early afternoon on the day of the incident, Nadene Abrams, who was in her bedroom, heard her mother ask the defendant, then in the kitchen, if he needed anything. The defendant then returned to his bedroom. A short time later, he came down the hallway and peered into Nadene Abrams's room. Just a little before 3:30 p.m., the defendant was sitting on the porch. Nadene Abrams took him a snack; Abrams refused it.

At 3:30 p.m., the local paper was delivered. Nadene Abrams took Abrams a portion of the paper and then joined her mother on the couch in the living room to read the paper. At about 4 p.m., the defendant came into the kitchen and looked into the stove. He then returned to the porch.

At about 5 p.m., Nadene Abrams prepared her brother's supper. Instead of eating, he returned to the porch. Nadene Abrams and her mother then had their supper. While Nadene Abrams was washing the dishes, Abrams came into the kitchen and looked at both his mother and his sister. He then went down the hall to his room.

When she finished the dishes, Nadene Abrams went out to the porch. She noticed that there were some limbs in the yard that had been blown down during a recent rainstorm; she decided to go out and pick up the limbs. She left the house via the living room door, retrieved a bucket, and began picking up branches.

After just a few minutes, Abrams came out of the house by way of the door on the opposite end of the house. He was carrying a maul. Nadene Abrams testified that the maul was customarily kept by the picnic table in the yard. Abrams put the maul on the ground by the corner of the house and sat down on the steps. After remaining there

for just a few moments, he retrieved the maul and returned to the house. Again, he was gone only a short time and then resumed his seat on the steps.

Nadene Abrams finished picking up the branches and started to go back into the house by way of the living room door. As she stepped up on the porch, Nadene Abrams saw through the window that something had happened to their mother. She tried to open the door but found it locked from the inside. She then ran around the house to the opposite door where her brother was sitting. When she started up the step, Abrams said "Don't go in. Don't go in. I think I've killed my mother. I think I've killed momma [sic]."

In his statement to the sheriff, Abrams stated that he was in the Hardin County jail because he had killed his mother. According to his statement, Abrams was not angry with his mother but killed her "[b]ecause of the Ruler job."[3]

Prior to trial, Abrams notified the State of his intention to rely on the insanity defense. Testimony elicited at trial indicates that Abrams has a long history of substantial alcohol abuse. He was hospitalized at Western State[4] on twelve separate occasions. All of these admissions were due to his alcohol abuse except for the last admission in February 1992.

In February 1992, Abrams was hospitalized after he held a gun on his sister and threatened her life. During this incident, Abrams apparently fired the gun although the record does not reflect that anyone was injured. When he was admitted to Western State as a result of this behavior, Abrams was diagnosed as delusional disorder paranoid. Abrams has taken Librium, an antidepressant, for many years, and he has a borderline intelligence.[5]

At trial, Amin Azimi, Ph.D., a psychologist, and Iokeya Farooque, M.D., a psychiatrist,

3. Sheriff Samuel Davidson took a statement from the defendant upon arrest. Davidson asked "Do you know why you killed your mother?" The defendant answered "I don't know. Because of the Ruler job." The record contains no further reference to a "Ruler job."

4. This facility is not properly described in the record. Most probably, it is the Western Mental Health Institute in Bolivar, Tennessee.

5. Abrams has an IQ of 71; below 70 is mildly mentally retarded.

testified for the State. Each opined that Abrams was competent and sane. In reaching this conclusion, neither doctor was aware that on the day of the murder, Abrams had accused his mother and sister of having someone or some machine checking up on him. Farooque also testified that she did not agree with the 1992 diagnosis of delusional disorder paranoid and that she had not observed any delusional behavior by Abrams during his evaluation.

The defendant offered no evidence.

## II

The issue on appeal is whether the evidence is sufficient to sustain the conviction. The standard of review is whether, after considering the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn.1985); Tenn.R.App.P. 13(e). As an appellate court, we do not substitute our evaluation of the evidence for that of the jury.

■ Tennessee Code Annotated § 39–13–202(a)(1) (1991) defines first-degree murder as "[a]n intentional, premeditated and deliberate killing of another...." Abrams contends that there is insufficient evidence from which a rational trier of fact could find the elements of premeditation and deliberation. In order to convict, the jury must find that the defendant formed the intent to kill prior to the killing and that the defendant killed with coolness and reflection:

> [t]he deliberation and premeditation must be akin to the deliberation and premeditation manifested where the murder is by poison or lying in wait—the cool purpose must be formed and the deliberate intention conceived in the mind, in the absence of passion, to take the life of the person slain. Murder by poison or lying in wait, are given as instances of this sort of deliberate and premeditated killing, and in such cases no other evidence of the deliberation

and premeditation is required; but where the murder is by other means, proof of deliberation and premeditation is required.

. . . .

The obvious point to be drawn from this discussion is that even if intent (or "purpose to kill") and premeditation ("design") may be formed in an instant, deliberation requires some period of reflection, during which the mind is "free from the influence of excitement, or passion."

*State v. Brown*, 836 S.W.2d 530, 539–40 (Tenn.1992) (citations omitted).

■ On the record before us, there is sufficient evidence from which a rational trier of fact could conclude that Abrams premeditated and deliberated prior to killing his mother. Nadene Abrams saw her brother come out of the house carrying the maul. Clearly then, Abrams had taken the murder weapon inside sometime earlier in the day. From his sister's description of his movements within the house during the day, there is evidence from which the jury could have concluded that Abrams was monitoring the movements of his mother and sister in order to find an opportune time to commit the crime. Thus, there is evidence from which a jury could conclude that Abrams had formed the intent to kill his mother earlier in the day and calmly waited until his sister left the house to commit his crime.

Notwithstanding our conclusion that the record supports the jury's verdict, we are troubled by the sparseness of that record. The experts who evaluated Abrams concluded that he was competent to stand trial and sane. However, it is clear from the record that these experts were unaware that on the day of the murder, Abrams thought his mother and sister had someone with a machine checking up on him. Apparently, these experts were also not privy to the events leading up to his hospitalization in 1992 when Abrams was delusional and held a gun on his sister.[6]

---

**6.** Azimi testified that had he been privy to this information, it might have affected his conclu-sions, but he did not state in what way.

Thus, there are indications that Abrams may suffer from a mental condition evidence of which might have been relevant on the issues of premeditation and deliberation. In *State v. Phipps,* 883 S.W.2d 138, 149 (Tenn.Crim.App.1994), then Judge White held that evidence of the defendant's mental state was relevant and admissible to negate the elements of premeditation and deliberation:

> when the general law provides that "[n]o person may be convicted of an offense unless ... [t]he culpable mental state required ... is proven beyond a reasonable doubt," evidence tending to make the existence of that mental state "more probable or less probable" is relevant. As such, it is admissible.
>
> To find otherwise would deprive a criminal defendant of the right to defend against one of the essential elements of every criminal case. In effect, then, such a finding would deprive the defendant of the means to challenge an aspect of the prosecution's case and remove the burden of proof on that element in contravention of constitutional and statutory law. While the law presumes sanity it does not presume mens rea. Due process requires that the government prove every element of an offense beyond a reasonable doubt.

*Id.* at 149 (citation omitted). We agree with the general holding of *Phipps,* that evidence of a defendant's mental condition can be relevant and admissible in certain cases to rebut the mens rea element of an offense. In *State v. Abrams,* 1995 WL 146110 (Tenn.Crim.App. 1995), unlike *Phipps,* evidence of the defendant's mental condition was not proffered, and the jury instructions at issue in *Phipps* are not at issue here. Thus, whatever further development may be warranted for the rule of "diminished capacity," we defer to another day.

After considering the evidence in a light most favorable to the prosecution, we find that any rational trier of fact could have found the essential elements of this crime beyond a reasonable doubt. *Jackson v. Vir-*

*ginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

DROWOTA, ANDERSON, REID and WHITE, JJ., concur.