IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs July 9, 2002

## STATE OF TENNESSEE v. MILA SHAW

**Direct Appeal from the Criminal Court for Shelby County**
**No. 98-08948     Chris Craft, Judge**

---

**No. W2001-02430-CCA-R3-CD - Filed January 16, 2003**

---

The defendant was found guilty by a jury of theft of property over ten thousand dollars ($10,000) and sentenced to four years and six months in the county workhouse. She contends the evidence was insufficient to sustain the conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

Mozella Ross (at trial), and Gerald S. Green (on appeal), Memphis, Tennessee, for the appellant, Mila Shaw.

Paul G. Summers, Attorney General and Reporter; J. Ross Dyer, Assistant Attorney General; William L. Gibbons, District Attorney General; and Teresa S. McCusker, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

The defendant, Mila Shaw, was indicted on July 21, 1998, on one count of theft of property over the value of $10,000, but under the value of $60,000, a Class C felony. The indictment resulted from the following facts. Ms. Wilhelmein Thompson died from breast cancer on March 25, 1997. Shortly before her death, the defendant moved in with Ms. Thompson to assist her. The defendant and Ms. Thompson had been friends for quite some time. The defendant obtained a notarized power of attorney, signed purportedly by Ms. Thompson.

After Ms. Thompson's death, the defendant, using the power of attorney, redeemed one of Ms. Thompson's certificates of deposit (CD), worth $31,406.60, at the Union Planters Bank in Memphis. The defendant had the money distributed in cashiers' checks: $10,000 to herself; $3,600 to Mary Little, her mother; $4,700 to Charles Knox, her fiancé at the time; and $4,700 to Rochelle Cade, her uncle. The remainder went to the defendant in cash. The defendant stated those amounts were paid because those individuals helped her while she was caring for Ms. Thompson.

The defendant was convicted by jury of theft of property, Tenn. Code Ann. § 39-14-103. The value of the theft was placed at $31,406.60, making it a Class C felony. Tenn. Code Ann. § 39-14-105(4). She was fined $10,000 and sentenced to the county workhouse for four years and six months.

The defendant claims the evidence was insufficient to convict her of theft of property. Specifically, she claims that Ms. Thompson wanted her to have the power of attorney to act on Ms. Thompson's behalf and to be able to repay her for the comfort and kindness she had shown her. The defendant claims she did not know that a power of attorney expires upon the death of the principal. She claims her ignorance makes it impossible for her to have achieved the required mental state of "knowing" for her theft of property. After a thorough review of the evidence, we conclude sufficient evidence exists to convict the defendant, even if she was unaware her power of attorney expired with the victim's death. Further, there is ample evidence that she fraudulently obtained the power. Thus, she did knowingly deceive Union Planters in obtaining $31,406.60.

## Trial

The defendant was tried by a jury on May 15, 2001. The State called as its witnesses: Ronnie Thompson, Lue Smith Young, Evelyn Cooper, Officer Gregory Sanders, Lenal Anderson, and Phillip Cooper. The defense called as its witnesses: Mary Little, Mary Johnson, and Ernest Withers. The defendant testified on her own behalf.

Ronnie Thompson, the victim's son-in-law who was employed with the Memphis Police Department (MPD) as a supervisor with the metro gang unit,[1] testified that the victim, his stepmother, was married to his father for thirty years. He said the victim died in March of 1997 of breast cancer, and his father died in November of 1996. He said that he visited the victim twice a week over the last two years of her life. He met the defendant for the first time at his father's funeral. The victim asked the defendant to stay at the victim's home. He said the defendant had moved into the victim's home two weeks prior to the victim's death. The victim's condition began to worsen prior to the defendant moving in with the victim. Thompson said the victim became unable to feed herself, slept more, and was unable to walk without assistance. He identified a photograph as portraying the victim and his father, and that picture was introduced into evidence.

---

[1] Mr. Thompson was not testifying in his official capacity.

Thompson testified that the victim cared for her own business affairs during her illness. He said he paid some bills for her, as well as doing some of her grocery shopping. He was shown a power of attorney document (POA) and said that he recognized the document as paperwork he acquired from attorney, Lenal Anderson. A receipt from Anderson in the amount of $175, for the preparation of a POA ,was produced. This was paid by Ronnie Thompson on March 19, 1997. He said he gave the POA to the defendant to have the victim sign it and return it to him. He left the documents with the defendant and did not get the victim's signature because the victim was sleeping. He stated that he never retrieved that POA from the defendant. He stated that he attempted to take care of the victim's affairs after the victim died but had difficulty, because the victim's personal papers had disappeared.

Thompson testified that he became administrator of the victim's estate after the victim's brother, who was originally to have been the administrator, developed cancer and consented to Thompson becoming the administrator. He said he could not find the victim's will. Therefore, the victim's estate was opened intestate on or about April 4, 1997. Once appointed as administrator, he said that he was charged with taking care of her bills and turning off her utilities and phone. He said the estate consisted of the victim's house, the ownership of which is still contested, and a safety deposit box, which was inventoried. He said all of the victim's personal belongings had been removed from the victim's house. He said that his duty, as administrator, was to take charge of the property, liquidate the assets, and give them to her relatives. He said the victim's brother is now dead, and the victim's assets would now go to her other siblings since she had no children. He only received a fee for his service as administrator, and he did not stand to inherit from the victim's will. He attended the funeral and saw the defendant there. He identified the defendant, at trial, as the same person he had previously discussed.

Thompson testified that, while arranging and liquidating the victim's estate, he located several certificates of deposit (CDs) belonging to the victim. He stated that the CDs ranged in amounts from $8,000 to $30,000 and that he did not give the defendant permission to have any of them. He said the victim had accounts at several banks, including Tri-State Bank, NBC Bank, and First Tennessee Bank.[2] He did not know of anyone else who could have given the defendant permission to access the victim's bank accounts or CDs and was not aware of the victim providing for the defendant in her will. He said the victim's maiden name was Williams, then Lockhard, before marrying his father. The victim always used the last name of Thompson.

On cross-examination, he testified that he was reared by his biological mother. During the early years of his father's marriage to the victim, he was in the military. He did not have a close relationship with the victim. His father and the victim lived alone in their house until his father died of Lou Gehrig's disease. He said that he would take his father and the victim to Alabama for his father's medical treatments. He said as they got older, he began to visit his father and the victim a couple of times a week, in order to check on them. His father lost the use of both of his arms

---

[2] And, obviously she had a CD at Union Planters Bank.

because of his illness. The victim was healthy, and she took care of his father until his father's death. He testified he did not know the victim had breast cancer until a year or so before her death.

Thompson testified that he did not remember the defendant taking the victim to any medical appointments. He said the defendant watched the victim's home while he went to his father's funeral. During the last days of the victim's life, he stated that the victim did need help, but was not totally incapacitated. He said that during the time the defendant lived with the victim, the victim tended to sleep most of the day. He testified that the victim could not feed or bathe herself and had difficulty walking. He said that during the time the defendant cared for the victim, he thought he could trust the defendant. He stated that because he trusted the defendant, he left the POA with the defendant for the victim to sign. He said that at the time of her death, the victim looked different than in previous pictures because she had lost some weight. He said the victim was not mentally incapacitated before her death. He stated that the POA required the signature of a notary public, but was not sure if the victim needed to sign her name in the presence of a notary public. He notified all of the banks that the victim had died. He testified to working long hours with the police department and worked on varying shifts from November of 1996 to the end of March 1997.

On redirect examination, Thompson testified that he went to Union Planters Bank to notify them of the victim's death. He stated that bank personnel informed him that the victim had assets in their bank. Additionally, he testified that the victim's brother came from California to the funeral and that he had to stay in a hotel room because the defendant would not allow him (the brother) into the victim's home. He said he asked the defendant if the victim's brother could stay in the victim's home during the funeral, and she said that he could not. He testified that he went to the victim's home on the night of her death to check on her personal effects and get paperwork to prepare for the funeral. He said the locks to the victim's home had been changed, so he forced his way into the victim's home. Once inside the victim's home, he said that he noticed that all of her personal effects had been removed and all of her clothing was gone. He said that the defendant now lives in the victim's home.

On recross-examination, Ronnie Thompson testified that the victim's brother came from California to the victim's funeral. He stated that the victim's brother stayed at the Holiday Inn and was in Memphis for three days. He said that after the victim's funeral, he and the victim's brother went by the victim's home, where the victim's brother told him that he asked the defendant if he could stay at the victim's home and she said he could not. He stated that the victim's brother did not know the defendant. He testified that he qualified as administrator of the estate of the victim around April 2, 1997. He said the locks to the house had been changed the day of the funeral. He testified that he had to break the door to get into the victim's home. He stated that he did this in order to handle the victim's affairs since he had handled her affairs in the past. He said that he did not know who had the keys to the victim's home. Additionally, he testified that two days prior to the victim's death, the defendant had access to everything, yet the defendant was not present and he did not know where to locate the defendant. He said that he wondered where the defendant had been immediately prior to the victim's death. He stated that the defendant was in possession of his deceased father's car at the time of the victim's death. He said that after getting inside the victim's

home, he did take some papers, but did not take any furnishings. He testified that he secured the house with a lock that he bought. Furthermore, he stated that the defendant was in possession of his deceased father's car and that he saw the defendant in the car.

On further redirect examination, Thompson testified that he saw the defendant driving his father's car after the victim's funeral. He stated that he confronted her about missing items from the victim's home, and she replied that they belonged to her. He called the police after his meeting with the defendant. On further re-cross examination, Thompson testified that on April 2, 1997, the defendant was living in the victim's home.

Lue Smith Young, a branch manager at Union Planters working in that capacity on April 8, 1997, testified she was involved with the victim's accounts and that she was the person who issued the checks against the CD on the victim's accounts. She said that she did not look over the POA presented to her, but made copies of the account numbers that the defendant requested. She said that several of the accounts were not in the victim's name, but were in the name of Charles Thompson and the victim. She stated that on April 8, 1997, the defendant had a POA and withdrew all of the certificates of deposits belonging to the victim. She stated that she did not release the funds to the defendant until the bank's legal department authorized the transaction. She said that she released $31,406.60 to the defendant. She also stated that the defendant had the funds issued into various amounts to Mary Little, Charles Knox, Rochelle Cade, and the defendant. Additionally, she said the defendant withdrew more than $8,000 in cash.

On cross-examination, she stated that she did not know what specific things the legal department at her bank does with power of attorney documents. She said that her bank kept signature cards on the victim's bank accounts and that the legal department looked at the victim's signature before releasing any money to the defendant. She said that the victim's first name was spelled differently on two of the documents, but this was approved by the legal department.

Evelyn Cooper, manager of M. J. Edwards Funeral Home on March 19, 1997, testified that she was a notary public and managed the operations of the funeral home. She stated that on March 19, 1997, she notarized paperwork for the defendant. She said the defendant initially showed up alone wanting a POA notarized for both herself and the victim. She then told the defendant that she could not notarize anything unless that person is in her presence. The defendant then left. The defendant returned in an hour with someone she purported to be the victim. She said that the woman gave her a signed social security card and a signed voter's registration card, but did not present any picture identification. She stated that, before notarizing the paperwork, her co-worker took the identification out into the hall while the woman signed the documents. She said a picture of the victim was not the same woman that she saw at the funeral home.

On cross-examination, Ms. Cooper testified that she is a licensed funeral director and has worked for M. J. Edwards since 1980. She said that the woman, who claimed to be the victim, looked older because she was wearing a wig, shawl, and walking with a cane. She said that the signatures on the identification the woman presented to her matched the woman's handwriting. On

redirect examination, the witness identified the defendant as the same person who approached her to notarize the documents. On recross examination, the witness admitted she wears corrective lenses.

Officer Gregory Sanders, an MPD internal affairs sergeant working in the fraud division on August 5, 1997, testified that Ronnie Thompson filed a complaint alleging the defendant fraudulently obtained money from the victim. He said Thompson presented him with the POA used to obtain the CD from Union Planters, allegedly signed by both the defendant and the victim. Officer Sanders testified he began his investigation by contacting attorney Lenal Anderson and the notary public from Union Planters. He said he determined that someone other than the victim signed the documents in the presence of the notary. He said that he contacted Mr. Lee, a Union Planters Bank investigator, to inquire about any money obtained from the victim's accounts. He testified that bank personnel pointed out the defendant from a photo array as the person who withdrew money from the victim's bank accounts.

On cross-examination, he said that he did not give his investigation any special attention due to the fact that the complainant, Ronnie Thompson, was with the MPD. He said that once he completed his investigation, he concluded that the defendant was responsible for the theft of the victim's accounts. He said there was enough probable cause to issue an arrest warrant for the defendant.

Lenal Anderson, an attorney in Memphis for almost twenty-two years, testified he met Ronnie Thompson and prepared a durable POA for him. When presented with the POA the defendant alleged the witness had prepared for her, he stated that he did not prepare the document and that it did not have his signature. He said that he did know the victim.

On cross-examination, Anderson stated that he knew the defendant and victim through his employment at LeMoyne-Owen College, over twenty years ago. He said that he knew the defendant and the victim had a close relationship. He said that he met Ronnie Thompson in March of 1997. He said he had a business relationship with the defendant and handled some legal matters for her in the past. He said that he did not know where the defendant obtained the POA she used to withdraw funds from the victim's bank accounts. He said he prepared a previous POA for the defendant, although on redirect, he reiterated that he did not prepare the POA at issue. He stated that he had handled civil matters for the defendant over a span of fifteen years. On recross-examination, he stated that the last time he saw the victim was in the 1980s. He stated that he was unaware of the extent of the relationship between the victim and the defendant. He said that the defendant took care of sending in the victim's obituary and gave the victim's eulogy.

Philip Cooper, an attorney in Memphis for thirty-nine years, testified that he practices probate law and was involved with the victim's estate. He said that the victim's estate was opened without a will on April 2, 1997. He said that the administrator was Ronnie Thompson, because the victim's elderly brother did not want to be appointed as administrator. He said that the victim's estate, consisting of a home, an automobile, and some jewelry, was worth approximately $200,000. He

said that the estate was still open and that some of the assets supposed to be a part of the total estate were no longer present. He said a CD worth approximately $34,000 could not be found. He stated that he expects Union Planters Bank to reimburse the estate for the value of the CD. He said the defendant was holding assets that belonged to the estate. Additionally, he stated that the defendant, dealing with him on estate matters, was uncooperative, even "totally adversarial."

On cross-examination, Cooper reiterated that the defendant would not cooperate with his handling of the estate. He said that "we found out we had a deed that had been transferred to defendant's name" and that he talked with her about the deed. On redirect examination, he stated that Union Planters would reimburse the estate for the value of the CD, because the bank negligently allowed the defendant to make a withdrawal from the victim's account within ten days of the victim's death.

**Defense:**

Mary Little, the defendant's mother, testified that she became acquainted with the victim during the time she attended Lemoyne-Owen College. She said she met the victim in 1952 and had a relationship with the victim before the defendant was born. She said that the victim asked the defendant to move in with her and to take care of her. She stated that the defendant cared for the victim. She said that she and the victim did not have a close relationship but that the victim had a relationship with the defendant and the defendant's brother. She said there were times when the victim gave money to the defendant's brother and that the victim gave away gifts. On cross-examination, she identified a check with her name on it from Union Planters in the amount of $3,600.

Mary Johnson, the defendant's sister, testified that she knew the victim for approximately thirty-eight years and that they attended the same church. She said that her brother and the defendant stayed with the victim after her husband died. She said that the victim gave the defendant a car after the victim's husband died. She said the defendant lived with the victim some time after the victim's husband died, and she would drive the victim to the doctor. She stated that the defendant prepared the victim's funeral arrangements. She said that the victim and the defendant were close, as evidenced by the victim asking the defendant to move into her home. She said that the victim gave the defendant's brother $10,000, because he needed money.

On cross-examination, Johnson testified that the victim was alive when she gave the money to the defendant's brother. She said the defendant told her that the victim gave her a car. On redirect examination, she testified that she had not seen the victim since the 1990s and that the victim looked different from a picture she viewed. On recross-examination, the witness stated that she had not seen the defendant since 1992.

Ernest C. Williams, a photographer in Memphis, stated that he has been a photographer for sixty years and owns his own studio. He said he knows how to develop pictures and was trained in the U.S. Military at Camp Sutton in North Carolina. He stated that he has known the defendant all

of her life. Additionally, he said that he also knew the victim from the time she was a child. He stated that he saw the victim within two years before she died. He identified a woman in a photograph as resembling the victim. He said he attended the victim's funeral and knew that the victim had a close relationship with the defendant and the defendant's brother.

The defendant testified on her own behalf. She said she is a photojournalist, salesperson, assistant, and consultant. She said that she had known the victim since she was a child, when their families attended the same church. She said she helped the victim after the victim's husband died and that the victim asked her to do so. She said she lived with the victim for months before the victim's death to assist her with business transactions and personal needs.

The defendant said that Ronnie Thompson was not truthful in his testimony. She said that she was with the victim at the time of her death and that the victim was in the intensive care unit at the end of her life. She said she called Ronnie Thompson and his brother to tell Thompson to take the victim to the hospital to get fluids. She said that the victim chose not to receive any medical treatment for her cancer. She identified a photograph of the victim but stated that the photograph was twenty years old. She said the picture looked different due to the changes the cancer produced.

The defendant testified that she remembered Ronnie Thompson presenting her with a POA so that she could have the victim sign it. She said the victim was not asleep when he came to the victim's home with the POA, but the victim refused to sign it. She said that the victim wanted her (the defendant) to have the power to take care of her (the victim's) affairs. She said she wrote Lenal Anderson's name at the top of the POA in question and got the language of the document from other documents he had previously prepared for her. She said she stamped the document with Lenal Anderson's name in order to give him credit for being the original preparer of the work. Because she did not have a form, she said that she made the POA herself. She said she had the document stamped and registered and that it passed for a document prepared by Lenal Anderson. She stated she took the document to Union Planters Bank and knew the purpose of a POA.

The defendant said that on the day she took the POA to be notarized, she and the victim went to the funeral home to have the document signed and executed. She said that the victim was married to a judge prior to marrying her last husband and knew that she did not want her things to go to the state or to her brother. She said that she made the funeral arrangements for the victim and gave her eulogy.

The defendant said she did withdraw funds from the victim's bank account at Union Planters. She said that she presented the POA to bank personnel, and the bank's legal department reviewed the document. She said she went to the bank, collected cashier's checks from one of the victim's CDs, and distributed the checks to Mary Little, Charles Knox, Rochelle Cade, and herself. She said the check to herself was to pay for the services she had rendered to the victim prior to her death. She said the victim wanted her to give money to the defendant's family for being supportive of the defendant. She also stated the victim wanted her to distribute money to her church and to Lemoyne-Owen College. She said that she gave gifts to the victim, and the victim gave her gifts.

The defendant said she did not take advantage of the victim and that they had enjoyed a close relationship. She said she did not change the locks to the victim's gates or house. She said Ronnie Thompson kicked in the door of the victim's house and accused her of stealing the victim's furs. She stated that she and Ronnie Thompson had several confrontations concerning the victim's car. She said that she never told the victim's brother that he could not stay at the victim's home after the victim's death.

On cross-examination, she testified that her prior knowledge of POAs involved her obtaining POAs for her father and two other individuals. She stated that she used the money from the CD in question to show gratitude and appreciation to those people who had shown her support during the time she helped the victim. She said she did not get any money from the victim while she was alive, but the victim had given her gifts. She said that she did not steal from the victim's estate and continued to live in the victim's home until the time of trial. She also said that she had not given any money back to Union Planters but no longer had possession of the victim's car because Ronnie Thompson had it towed. She said she filed a claim against the estate for $377,000 for spiritual guidance to the victim during her life.

The defendant was convicted by a jury of theft of property over $10,000.00, in violation of Tennessee Code Annotated section 39-14-103. The value of the theft was placed at $31,406.60, making it a Class C felony. See Tenn. Code Ann. § 39-14-105(4). The trial court sentenced her to the county workhouse for four years and six months and fined her $10,000.

## II. Analysis

Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact. See State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996); State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984).

The defendant was convicted of theft of property. The Tennessee theft of property statute reads, "A person commits theft of property if, with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code. Ann. § 39-14-103. The grading of theft of property is based on the value of the theft. Tennessee Code Annotated section 39-14-105(4) reads, "Theft of property or services is: A Class C felony if the value of the property or services obtained is ten thousand dollars ($10,000) or more, but less than sixty thousand dollars ($60,000)." The value of the property in question was thirty-one thousand four hundred and six dollars and sixty cents ($31,406.60).

In order to obtain a conviction for theft, the State must prove: (1) the defendant knowingly obtained or exercised control over property; (2) the defendant did not have the owner's effective consent; and (3) the defendant intended to deprive the owner of the property. State v. Amanns, 2

S.W.3d 241, 244-45 (Tenn. Crim. App. 1999) (citing Tenn. Code Ann. § 39-14-103). Theft of property may be accomplished in one of two manners: (1) taking or obtaining property without consent and with the intent to deceive; or (2) exercising control over property without consent and with the intent to deceive. State v. Byrd, 968 S.W.2d 290, 292 (Tenn. 1998).

It is uncontroverted that the defendant knowingly obtained the property. It is also uncontroverted that the defendant intended to deprive the owner of the property. The dispositive issue is whether the defendant had effective consent. "Effective consent" refers to one's assent, whether express or apparent, including assent by one legally authorized to act for another. Consent is not effective when: (1) Induced by deception or coercion; (2) Given by a person the defendant knows is not authorized to act as an agent; (3) Given by a person who, by reason of youth, mental disease or defect, or intoxication, is known by the defendant to be unable to make reasonable decisions regarding the subject matter; or (4) Given solely to detect the commission of an offense. Tenn. Code Ann. § 39-11-106(a)(9). The jury observed the witnesses and heard the testimony. Therefore, the jurors were in the best position to make determinations as to whether the defendant had effective consent. See State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996); State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984).

A rational jury could have weighed the credibility of the witnesses and determined that the woman, who signed the POA in March 1997, was not Ms. Thompson. A rational jury could have concluded that Anderson did not prepare the document and that the defendant did intend to deceive Union Planters through use of this POA. A rational jury could have determined that the defendant acted fraudulently, with intent to deceive, in analyzing acts such as the defendant including the stamp stating the document was prepared by Anderson, when in reality, Anderson had nothing to do with the particular POA. There was ample evidence for the jury to rely upon in order to convict the defendant. We conclude the evidence was sufficient for conviction.

Having determined that the evidence was sufficient in order to convict the defendant, the issue as to whether the defendant was mistaken in her belief that she still had the power of attorney to act on behalf of Ms. Thompson is not dispositive. Nonetheless, it merits a brief discussion. Tennessee Code Annotated section 39-11-502(a) states, "Except in prosecutions for violations of §§ 39-13-504(a)(4) and 39-13-522, ignorance or mistake of fact is a defense to prosecution if such ignorance or mistake negates the culpable mental state of the charged offense." Therefore, it is possible that the defendant's mistake as to the expiration of her power could have rendered her not culpable. Based on the evidence as weighed by the jury, however, this was not the case. Because the jury was presented with enough evidence to determine that the defendant fraudulently created the POA and used that fraudulent document in order to induce Union Planters into giving her the value of the CD, the fact her power had expired becomes irrelevant. The "no consent" prong for theft of property, Tenn. Code Ann. § 39-14-103, would have been satisfied by the defendant obtaining consent through deception.

**CONCLUSION**

Ample evidence exists to allow a rational jury to conclude beyond a reasonable doubt that the defendant intended to deceive the Union Planters Bank in order to obtain the CD worth thirty-one thousand four hundred and six dollars and sixty cents ($31,406.60). Having determined there was

sufficient evidence for a jury to reach its conclusion in the instant case, the defendant's argument of "mistake of fact" is rendered moot. Accordingly, we affirm her conviction.


_____
JOHN EVERETT WILLIAMS, JUDGE