# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs August 6, 2002

## STATE OF TENNESSEE v. RICKY BLAIR

**Direct Appeal from the Circuit Court for Haywood County**
**No. 4521     L.T. Lafferty, Senior Judge**

---

**No. W2001-02965-CCA-R3-CD  - Filed April 11, 2003**

---

The defendant was convicted by a jury of attempted second degree murder, aggravated assault, and setting fire to personal property.  The defendant received an effective sentence of nine years.  The sole issue on appeal is whether the evidence was sufficient to support his conviction for attempted second degree murder.  We affirm the judgments from the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and THOMAS T. WOODALL, JJ., joined.

J. Colin Morris, Jackson, Tennessee, for the appellant, Ricky Blair.

Paul G. Summers, Attorney General and Reporter; Braden H. Boucek, Assistant Attorney General; Garry Brown, District Attorney General; and Larry Hardister, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

After seventeen years of marriage, the defendant, Ricky Blair, and his wife, Nadine Blair, became estranged.  They had lived apart approximately one and one-half weeks when the defendant asked his wife, the victim, to stop by their home.  She stopped by at approximately 9:30 p.m. on July 31, 2000.  The defendant was upset upon learning the victim had blocked long distance service to their telephone.  The defendant and victim began to argue.  The victim left, and the defendant followed her to her car.  The victim was shot twice by the defendant.

The defendant was indicted on six counts:  (1) attempted first degree murder, in violation of Tennessee Code Annotated sections 39-13-202 and 39-12-101; (2) aggravated assault, in violation of Tennessee Code Annotated section 39-13-102; (3) harassment, in violation of Tennessee Code

Annotated section 39-17-308; (4) setting fire to personal property or land, in violation of Tennessee Code Annotated section 39-14-303; (5) assault, in violation of Tennessee Code Annotated section 39-13-101; and (6) making a false report to police, in violation of Tennessee Code Annotated section 39-16-502.

After a jury trial, the defendant was convicted of attempted second degree murder, a Class B felony, in violation of Tennessee Code Annotated sections 39-13-210, and 39-12-101, and a lesser-included offense of attempted first degree murder; aggravated assault, a Class C felony; and setting fire to personal property or land, a Class E felony. He was sentenced to nine years for the attempted second degree murder and one year for setting fire to property, to be served concurrently. The sentence for the aggravated assault merged with the attempted second degree murder. The defendant's motion for a new trial, alleging insufficient evidence to convict of attempted second degree murder, was denied.

## Issue

The sole issue raised on appeal is whether the evidence was sufficient to sustain the defendant's conviction for attempted second degree murder. Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

As such, we must review the trial testimony in order to determine if any rational trier of fact could have found the essential elements of both second degree murder and attempt, beyond a reasonable doubt.

## Trial

The defendant does not deny that his gun fired and shot the victim twice. His claim is that he only brandished his gun in self-defense after the victim began to drive off in the car while the defendant's arm was caught in the car window. He claims that, after brandishing it, the gun was unintentionally fired. He claims that being dragged by the car caused him to suffer some injuries. On the other hand, the state contends that the defendant shot the victim before she drove off and that the defendant was upset with her and planned to kill her for quite some time.

The dispositive question in determining whether a jury could have found beyond a reasonable doubt that the defendant was guilty of attempted second degree murder, is whether a rational jury could have found the defendant fired his gun before the victim drove off, thereby negating that the

defendant fired out of necessity or self-defense because he was being dragged by the car. We will only examine the evidence relevant to this issue.

The State presented witnesses Nadine Blair, Johnny Blackburn, Rikeita Blair, Shawn Williams, Dr. Robert Mitchell, Taylor Evans, David Smith, Ben Patterson, Jim Parks, Ola Tyus, Tylus Carrie, Kim Williams, and Dinnah Calaug. The defense presented Ricky Blair, Jr., Bobby Slayton, Glenda Slayton, and the defendant.

Nadine Blair, the defendant's wife and the victim, testified she was not living with her husband on the day in question but had gone by his house around 9:30 p.m. because he asked her to. She said they argued over the long distance service, which led her to want to leave. She said she went to her car, put her key in the ignition, and then, as she was hooking her seatbelt, the defendant "reached behind him with his gun and shot [her]." She said she blacked out but then regained consciousness and drove "[m]aybe a mile and a half" to an Exxon station.

The victim testified that at the time of the shooting, her son was sitting on the back of one of the cars[1] and, after the first shot was fired, her son said, "Daddy, what you doing? That's momma." She said that after she was shot the second time, she started the car and let her window up, catching one of the defendant's arms in the window. According to the victim, after she made it to the Exxon station, she was taken to an emergency room, then by helicopter to the Regional Medical Center in Memphis, where she spent nine days due to her injuries.

The victim testified that she had been threatened by the defendant prior to the shooting incident. She said that one morning in March of 2000, just before she was going to get ready for work, the defendant told her, "If you go to work, I'm going to come out there and shoot you and your co-workers." She said that in May of 2000, the defendant was upset with her due to her betting on a ball game, so he got his gun and put it to her nose, demanding she call the individual with whom she was betting. She further testified that in June of 2000, the defendant woke her from sleep wanting to talk with her about a man with whom she worked , then grabbed her and said, "Bitch, I'm going to kill you." After that, she said she ran out of the house to give him time to calm down but, instead, the defendant took her clothes from the closet and set fire to them. She said the defendant kept a gun in his closet. She said she left the defendant about a week and one-half before the shooting.

On cross-examination, the victim admitted to carrying a gun in her car but said she did not have it with her on the night in question. She denied ever threatening the defendant. She denied having an affair with a coworker, Bobby Slayton, and denied ever making threats to Slayton's wife.

As to the night of the shooting, the victim said there was no "flare-up" but that the defendant calmly walked to her car and shot her "out of the blue." She said that she did not put the car into gear until after she was shot and that after she was shot the second time, she raised the car window

---

[1] Although not clear in the record, apparently there were other cars in the driveway.

-3-

and drove off. She said that the defendant held the gun in his left hand and that his left arm got caught in the window.

Johnny Blackburn, a police officer with the Brownsville Police Department, testified that during an interview with the defendant, the defendant told him that his (the defendant's) right arm was caught in the window of his wife's car when the car started rolling and dragging him. Blackburn said the defendant told him that he grabbed his gun with his left hand and told the victim if she did not stop driving and dragging him by his stuck arm, he would shoot. The defendant then told Blackburn that he fired two shots and fell from the car. Blackburn stated the defendant did have injuries on his right side. Additionally, Blackburn said the defendant told him he drank about two quarts of beer more than two hours prior to the incident.

On cross-examination, Officer Blackburn admitted he was not an eyewitness to the scene. He said that pictures depicting the defendant's injuries were consistent with the defendant's version of what happened.

Rikeita Blair, the victim's and defendant's daughter, testified that during the six months prior to the shooting, her mother left the home about three times. Additionally, she said that one night, while her father was drunk, he said to her mother, "I will kill you." Rikeita also said her father told her that he burned her mother's clothes because he was upset.

On cross-examination, Rikeita admitted she was not an eyewitness to the shooting. She said she knew Bobby Slayton and described him as the white man her mother was dating.

It is uncontroverted that the defendant and the victim had marital difficulties. It is also not disputed that the defendant's gun was fired and hit the victim two times, resulting in potentially fatal wounds. Additionally, it is not disputed that the victim drove some distance with the defendant's arm stuck in the window and that the defendant suffered some injuries resultant from that dragging. We will concentrate on the evidence that is relevant toward determining whether the defendant intentionally or knowingly shot the victim or whether he shot in self-defense.

Ola Tyus, the victim's sister, testified that the defendant and the victim "fussed and fought" all the time. She said that for about eight years she was aware of marital difficulties and that the victim left the home on occasion to stay with Ms. Tyus. She said she had previous conversations with her sister and told her sister to come stay with her "[c]ause you don't have to take that," referring to beatings the victim suffered. She said that she was aware of threats against her from the defendant and that her sister would sometimes come to work with bruises. On cross-examination, she admitted she did not witness the shooting but said she was aware of fights and arguments between the defendant and her sister. Additionally, she said she knew Bobby Slayton as a friend of the family.

Kim Williams, an administrative assistant training officer in child abuse with the Haywood County Sheriff's Department, testified that a summons for divorce was served against the defendant on the day of the shooting.

Ricky Blair, Jr., the defendant's son, testified for the defense. He said on the night of the shooting, he was sitting on top of the trunk of his mother's car when he heard her say, "Ricky!" He said he saw his father's arm in his mother's car window and tried to help get his father's arm from the window, but his mother started the car. He said his father was moving on the outside of the car.[2] He said, "She started up and let the window up and I saw his arm like that . . . and then all of a sudden I heard two shots, so I just ran and he drug on the floor– on the ground." He said his father was dragged from the middle of the driveway to the street.[3] He said his father suffered some scrapes and injuries. Additionally, he said his mother was having an affair with Bobby Slayton.

On cross-examination, Ricky Jr. remembered telling Officer Williams and the prosecutor that his father was dragged after the shots. On redirect, Ricky Jr. stated that his father's arm was caught in the car window before any shots were fired but that his father was dragged after the shots.

Bobby Slayton testified that he was romantically involved with the victim. On cross-examination, he said the affair began *after* the victim was shot.

Glenda Slayton, Bobby Slayton's ex-wife, testified that she divorced Bobby Slayton because he was having an affair with the victim and that she found out in December of 1999, before the shooting.

The defendant testified on his own behalf. He said he argued with his wife on the night of the shooting over the long distance service. He said as his wife was leaving, he went to the car she was driving to get the keys, because he needed accessibility to the car (Cadillac). He said he reached inside the car when she let the window up. He said his arm was caught, and as she drove away, Little Ricky[4] said, "Oh, no, momma! Don't do that!" He said Little Ricky then almost stumbled, so he basically pushed him away. The defendant said that he (the defendant) was being dragged and that he reacted by pulling his gun in order to defend himself. He said had he wanted to kill his wife, he could have done that. He said when he pulled his gun, the victim grabbed it, and it went off. The car then rolled some more, and the gun went off again. He said he did not think of shooting his wife prior to the event. He said he had a gun because guns were his "thing."

The defendant stated that a prior statement he made to Officer Blackburn, that he had shot his wife, was incorrect and what was meant in that statement was that his wife had been shot.

_____

[2] The testimony of this witness is conflicting. The witness says his father was moving on the outside of the car, but he also says he cannot recall the car moving.

[3] The record is unclear as to the distance from the middle of the driveway to the street.

[4] Little Ricky and Ricky Jr. are the same person.

Additionally, the defendant said that the victim being shot had nothing to do with her affair with Bobby Slayton and that he had not thought about shooting her prior to the actual shooting. He said he was aware of the pending divorce papers four days before they were served. He said he felt very remorseful about the incident.

On cross-examination, the defendant said that he pulled his gun from his waistband with the intention of defending himself. He said he did not remember pulling the trigger. He also denied telling his daughter that he was going to kill the victim and denied telling Officer Blackburn that he told his wife he was going to shoot if she did not stop. He said his son was untruthful when he said the car did not start backing up until after the shots were fired.

The defendant stated he used hydro-shock bullets in his gun because that is what the "ammo load" was. He said that type of ammunition fired at close range would have practically no effect on a shooting victim but, if shot at a distance of several feet, could cause extensive damage.

The defendant's motion for a judgment of acquittal was denied. He was convicted, *inter alia*, of attempted second degree murder. His motion for a new trial, in which he raised the issue that the evidence was insufficient to support an attempted second degree murder conviction, was overruled.

### Elements of the Crime

We now must determine whether the evidence, viewed in the light most favorable to the State, was sufficient for a rational jury to determine beyond a reasonable doubt that the elements of attempted second degree murder were met.

Tennessee Code Annotated section 39-12-101 defines attempt as:

(a) A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense:

    (1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

    (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

    (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

(b) Conduct does not constitute a substantial step under subdivision (a)(3) unless the person's entire course of action is corroborative of the intent to commit the offense.

(c) It is no defense to prosecution for criminal attempt that the offense attempted was actually committed.

Tennessee Code Annotated section 39-13-210(a) defines second degree murder as:

(1) A knowing killing of another; or

(2) A killing of another which results from the unlawful distribution of any Schedule I or Schedule II drug when such drug is the proximate cause of the death of the user.

A person acts knowingly, with respect to a result of the person's conduct, when the person is aware that the conduct is reasonably certain to cause the result. Tenn Code Ann. § 39-11-302(b). One commits second degree murder if one knowingly tries to kill another and succeeds in doing so.

**Analysis**

We conclude there was ample evidence to support the jury verdict. We agree with the State that, in finding the defendant guilty, the jury accredited the testimony of Nadine Blair and discounted the self-defense argument of the defendant. A finding of self -defense is a jury question, and a jury is free to believe a victim's testimony and reject a defendant's claim of self-defense, as this Court recently held. See State v. Michael Tucker, No. W2000-02220-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 1006, at *32 (Tenn. Crim. App. at Knoxville, Nov. 20, 2002). See also State v. Goode, 956 S.W.2d 521, 527 (Tenn. Crim. App. 1997); State v. Johnson, 909 S.W.2d 461, 464 (Tenn. Crim. App. 1995); State v. Ivy, 868 S.W.2d 724, 727 (Tenn. Crim. App. 1993).

Having concluded the jury was free to reject any claim of self-defense presented by the defendant, we not only find there to be ample evidence to support a conviction for attempted second degree murder, we conclude the evidence was overwhelming when considered in the light most favorable to the State.

The victim testified that the defendant shot her while she was in her car and then she drove off. She testified that the defendant threatened her life on more than one occasion. She testified to there being marital problems and anger between the parties. The essence of the victim's testimony is simply that after an argument with her husband, he walked with her to her car and, without provocation, shot her.

In addition to the victim's version of events, which, if accepted, clearly support a guilty verdict, there was the testimony of Rikeita Blair, who said she heard the defendant tell the victim, "I will kill you," within six months of the shooting. Ola Tyus testified that the defendant and victim fought and fussed all the time and referred to beatings the victim had suffered at the hands of the defendant. Evidence was presented indicating the defendant was aware of, and angered by, an alleged affair between the victim and Bobby Slayton. Additionally, evidence was presented that the

defendant was recently served with divorce papers from the victim. The defendant admitted carrying a gun, and it is undisputed that he walked to the victim's car with his gun and that the gun was fired and severely wounded the victim. Considering all of this and rejecting, as is within the province of the jury, any claims of self-defense by the defendant, the evidence more than sufficiently supports a finding that the defendant fired his gun at the victim before the victim drove the car with the defendant's arm caught inside.

The jury had ample evidence before it to conclude the defendant's shooting of the victim at close range was reasonably certain to, if successful, cause her death. It is clearly apparent that shooting a victim two times is a substantial step towards the completion of a murder.

We conclude the evidence was more than sufficient to support a guilty verdict of attempted second degree murder. Accordingly, we affirm the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE