# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 15, 2002 Session

## STATE OF TENNESSEE v. TIFFANY GOODMAN

**Direct Appeal from the Circuit Court for Grundy County**
**No. 3572-B     J. Curtis Smith, Judge**

---

**No. M2001-02880-CCA-R3-CD - Filed April 1, 2003**

---

The Defendant was convicted, along with her co-defendant husband, of child abuse and neglect, a Class D felony, and sentenced to four years probation. She appeals, claiming that the evidence was insufficient to support her conviction and that any neglect that did occur was the result of mistakes in parenting skills, such mistake vitiating any knowing abuse. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which DAVID G. HAYES and JERRY L. SMITH, JJ., joined.

Philip A. Condra, District Public Defender, and David O. McGovern, Assistant Public Defender, for the appellant, Tiffany Goodman.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; James Michael Taylor, District Attorney General; and Steven H. Strain and Sherry D. Gouger, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

The defendant, Tiffany Goodman,[1] gave birth to her daughter on November 1, 1999, in Jasper, Tennessee.[2] The child saw the doctor three times between birth and November 18, 1999. During those visits, there were no indications of malnourishment or growth problems with the child. According to medical personnel, they informed the defendant about proper feeding techniques and

---

[1] At trial, both parents were co-defendants, although only the mother appealed her conviction. Throughout the opinion there will be references to the "defendants" or "parents" indicating both the mother and father.

[2] Due to the victim's status as a juvenile, we will refer to her as the "child," "daughter," or "baby," and not by name.

other newborn issues during the initial visits. After seeing the doctor on November 18, 1999, the child was not seen by another health care professional until April 6, 2000, when the defendants brought her to the Marion County Health Department for shots. According to the defendants, during that time, the child had difficulty in taking nourishment, vomiting a progression of different formulas and different types of milk. The vomiting and refusal to accept feedings persisted between visits to the doctor. The defendants claim they noticed the child was underweight, but they were trying to remedy that problem by using different types of formula, albeit to no success. They claim they had no idea that the child was suffering any life threatening danger due to the malnutrition.

Kathy Lyle, a registered nurse with the Marion County Health Department, noticed the weight and malnourishment of the child and made a referral for the child to be seen by a doctor. Subsequently, a Department of Children's Services ("DCS") investigation led to an April 28, 2000, visit to Dr. Amy Evans, a physician at Emerald-Hodgson hospital ("Sewanee"). Dr. Evans described the child as "emaciated" and "malnourished." She determined the child was suffering from nutritional neglect and failure to thrive ("FTT"). Dr. Evans discussed nutrition with the defendants and ultimately prescribed Alimentum, an alimental formula that is easier for babies to digest. Once on the Alimentum, the child started gaining weight, stopped vomiting, and began to thrive. From April 28, 2000, through May 9, 2000, the defendants were responsible for feeding the child, yet the child's weight gain during that time was unsatisfactory to Dr. Evans. This led to hospitalizing the child on May 9, and ultimately, to DCS custody on May 12, 2000. The child was placed in foster care on May 15, 2000, and later with the paternal grandparents. There have been no signs of malnourishment or FTT since the defendants lost custody of the child.

The defendants were indicted for child abuse and neglect, in violation of Tennessee Code Annotated section 39-15-401, a Class D felony. They were convicted by a jury on February 16, 2001, of child abuse and neglect and sentenced as Range I standard offenders to four years with the Tennessee Department of Correction, all four years to be served on probation. Additionally, the defendants were required to participate in parenting skills training, mental health counseling, and home skills training. The defendant mother made a motion for a new trial, alleging, *inter alia*, that the evidence was insufficient to support her conviction. That motion was denied, leading to the instant appeal.

**Issue**

The main issue on appeal is whether the evidence was sufficient to support the defendant's conviction for child abuse and neglect. Additionally, the defendant claims any neglect that did occur was the result of a mistake or ignorance, specifically the defendant's ignorance about which baby formula would not result in her child vomiting. She claims that ignorance negates the "knowing" element required in the child abuse statute. Concluding that the neglect was not in the defendant's failure to discover the Alimentum, but in the defendant's failure to seek proper medical attention for more than four months in light of the child's weight loss and vomiting, we respectfully disagree.

**Standard of Review**

Where sufficiency of the evidence is challenged, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime or crimes beyond a reasonable doubt. Tenn. R. App. P. 13(e); Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Abrams, 935 S.W.2d 399, 401 (Tenn. 1996). The weight and credibility of the witnesses' testimony are matters entrusted exclusively to the jury as the triers of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996).

**Elements**

The defendant was convicted of violating Tennessee Code Annotated section 39-15-401, child abuse and neglect. The statute reads, in pertinent part: "(a) [a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor; provided, that if the abused child is six (6) years of age or less, the penalty is a Class D felony." Tenn. Code Ann. § 39-15-401(a). Our supreme court recognized that the offense of child neglect requires proof of three material elements: (1) that a person knowingly neglected a child, (2) that the child's age is within the applicable range set forth in the statute, and (3) that the neglect adversely affected the child's health and welfare. State v. Mateyko, 53 S.W.3d 666, 670 (Tenn. 2001), *citing* State v. Ducker, 27 S.W.3d 889, 896 (Tenn. 2000). In the instant case, the child was clearly within the applicable age range, under six years, and while the child seems not to have suffered any permanent damage because of the past neglect, her health and welfare were clearly adversely affected by the defendant's failure to provide the right type of formula. It belies common sense to conclude that a child described as "malnourished," and "emaciated," that was vomiting her intake for more than four months was not adversely affected. Nonetheless, while we will still review the evidence to determine if it was a rational finding that the child was adversely affected, the key determination is whether the defendant "knowingly" neglected this child.

"Knowing," as it relates to the conduct and circumstances of one's conduct is defined in Tennessee Code Annotated section 39-11-106(20) as follows: "'Knowing' refers to a person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." The defendant argues that she was unaware of the formula Alimentum and that throughout the course of the child's illness, she was never made aware of Alimentum and, therefore, she was ignorant as to any knowing neglect. We disagree. As stated earlier, it is not her failure to sooner avail herself of the better baby formula Alimentum that was neglectful, but her failure to seek proper medical attention ,despite being faced with a sick, vomiting, malnourished child. The jury found this to be knowing neglect. In order to determine if that was a rational finding, we must examine the evidence presented at trial.

**Trial Testimony**

The State presented Dr. Gilbert Ghearing, Dr. Amy Evans, Kathy Lyle, Mary Ann Rollins Gifford, Cheryl Brewer, Wanda VanHooser and Peggy Durham. The defense offered Robert Goodman, co-defendant James Goodman, Cynthia Cox, and the defendant. We will examine relevant testimony.

The child was born November 1, 1999. Dr. Gilbert Ghearing, a family practice physician at Grandview Hospital in Jasper, testified that the child's birth was routine. He said he did meet with the defendants at the hospital, and while unable to specifically recall the discussions with them, Dr. Ghearing testified that as a matter of course he goes over routine child care with new parents, discussing topics such as feeding, immunizations, and the need for follow-up doctor visits if any problems develop. Additionally, he said the defendants were given brochure information regarding the same topics. Included in that information was a paper titled, "Call your baby's doctor if . . . ," which included instructions to call the doctor if there was vomiting or spitting up most of a feeding two or more times, and if the baby refuses two or more feedings in a row.

Additionally, there was a handout that included a section titled, "Reasons to notify your baby's doctor," which included the same information. There was also a section of a pamphlet titled "Well-Baby Care," which listed among other things that "[y]our baby should be checked regularly by a doctor, *even when he/she appears normal and healthy* (emphasis added)," and that "[i]mmunizations against disease ...will be given at the proper time. It is important that these immunizations be started as recommended by your baby's doctor." Dr. Ghearing stated he recognized the defendant's signature, indicating she received a set of discharge instructions on November 3, 1999, from one of the nurses. He said those instructions would have included the information discussed above.

Dr. Ghearing testified to two follow-up visits with the defendants. On November 5, 1999, he said that the child had a jaundice condition and that the defendants mentioned to him about a vomiting episode. He said he told them that if such condition and episode continue, they should "follow-up p.r.n., which means if needed, if that continues." At the second follow-up visit, on November 18, 1999, Dr. Ghearing testified that the jaundice condition had cleared up and that the child's weight was very good. The defendants told him the child was on Enfamil with low-iron. He did not recall any complaints about allergies, throwing up, or about the child not eating. He further testified that, at birth, the child's length was 20 ½ inches and her head circumference was 13 ½ inches. He said that at a routine discharge, he would have discussed with the defendants the need for a follow-up visit for a hepatitis vaccination and routine checkups and that the follow-up should be done at a minimum of two months, and possibly in one month. Dr. Ghearing testified that after November 18, 1999, the child did not return to his office. Dr. Ghearing testified there were no indications during the three visits in which he saw the child that there were improper feeding techniques or improper growth.

-4-

Dr. Ghearing was cross-examined by counsel for both the defendant and her husband co-defendant. On cross-examination, Dr. Ghearing admitted there were no records indicating he wanted the defendants to reschedule with him after November 18. He also admitted that while he recognized that the defendant signed paperwork indicating she received the discharge packet, he did not know if she actually received the packet since members of his staff handled the task of distribution. Additionally, Dr. Ghearing discussed failure to thrive, stating there are both organic, or natural causes, and inorganic causes, such as improper feeding and stress. He admitted that one of the leading causes of inorganic failure to thrive was ignorance. He also stated that the child had a fungal condition known as "thrush" and that there could be a relationship between the thrush and the child vomiting.

Between November 18, 1999, and April 6, 2000, there is no evidence that the child received professional medical attention. James Goodman, the co-defendant at trial, testified that during that time, he went to see a Dr. Respess for himself. He said that during his doctor visit, Dr. Respess did look at the child and play with her a bit. He also said that in January they tried to address the child's immunizations at the Grundy County Health Department, but the health department was closed. He said they were trying to address the vomiting problem. The defendant said that during the time between November 18, 1999, and April 6, 2000, they tried to address the vomiting problem by switching formulas. She said in January or February, when the co-defendant went to Dr. Respess, that Dr. Respess did see the child and made no comment about the child's condition. She admitted that visit was for the co-defendant. Additionally, she said "sometime after" the Dr. Respess visit, they attempted to go to the Grundy County Health Clinic in Tracy City, but the clinic was visibly closed. She said they first went to the health department in Jasper at the "end of February, or early March, something like that" where clinic workers gave the child her immunizations and began informing the defendants about well infant care ("WIC") programs, and places to shop for formula.[3]

On April 6, 2000, the defendants took the child to the Marion County Health Department in Jasper. Kathy Lyle, a registered nurse at the clinic, testified that she saw the child and had some concerns because the child looked very small, sick, and underweight. She said she discussed these problems with the parents and that the parents told her they could not afford formula and were feeding the child milk and goat's milk. Nurse Lyle said the parents did not complain about the child vomiting. She said she referred the parents to Dr. Fox, a physician she regularly made referrals to, out of concern for the child being underweight. She said the parents made the actual appointment. According to DCS caseworker Wanda VanHooser, the defendants never met with Dr. Fox. Nurse Lyle said she gave the child some vaccinations. According to Lyle, a baby should have those shots around six weeks to two months of age and that this child, who was over five months old, had not received any shots since she was a newborn at Grandview Hospital. She then discussed the WIC program with the parents and gave them vouchers for two months worth of formula and discussed with them that when they ran out of vouchers they could come back to the clinic to pick up more. She stated that was one way to make sure children came back and got shots. When the parents left,

_____

[3] While the defendant testified this Jasper visit occurred in February or March, the visit to the Marion County Health Department in Jasper occurred on April 6, 2000.

Lyle said she gave them the usual papers about possible reactions to the shots. According to Lyle, there were no recorded follow-up visits to the Marion County Health Department.

On cross-examination, Nurse Lyle testified that the parents told her they had been giving the child some sort of nourishment every four to six hours, going from formula until they ran out, to whole milk, and then to goat's milk. She admitted that when the child was brought in, it was not an immediately life threatening situation. Lyle further stated that if a child merited such, she would contact DCS, but in this case she felt that a doctor should diagnose the child before any referral was made. Nurse Lyle further admitted that, according to a form from April 6, the baby's color was fine and that the general appearance was checked as being normal. Furthermore, she said she did mark parental interaction with the child as good, amplifying that answer to indicate that it was the father who had the interaction.

DCS received a referral on April 19, 2000.[4] Wanda VanHooser, the aforementioned child protective services worker with DCS in Grundy County, testified that she was assigned the case and made her first contact with the defendants on April 25, 2000. She said she went to the home in the "Gizzard" area on a mountain in Tracy City. VanHooser said the co-defendant came to her car but would not allow her in, telling her that the child was sleeping. They arranged for the family to bring the child to her office that afternoon. According to VanHooser, when they arrived at her office, the child looked "sick," "not clean," "like a skeleton with skin wrapped around it." She said the defendant did not pick up the child but left her in the carrier. Concerned about the child's health, VanHooser said she asked the defendant if she had taken the child to a doctor, to which the defendant said they had taken her to Dr. Ghearing in Jasper, but had not returned to Ghearing due to some insurance problems. VanHooser said she then contacted Dr. Evans and discussed her concerns with her, but she had the parents make the actual appointment, which was set for April 28, 2000. VanHooser said she also ordered two different services into the defendants' home in order to try and help the family and keep them together.

On cross-examination, VanHooser said the parents were cooperative with her. She said her concern was that the parents had not followed through with what they were supposed to do, as far as taking the child to the doctor. She said she was trying to address social concerns in the home that could effect the health of the child. She admitted that one of the services she attempted to place in the home, the services of Kelly Lusk, never happened, as Lusk had scheduling problems. She said that one service, Children and Family Services, did go into the home, although she was unsure if that was before the child was placed into state custody.

Furthermore, VanHooser testified that she indicated the child as a possible FTT in the referral she made for Dr. Evans. She said there is a social aspect to FTT in which parents may not have knowledge about caring for a child, but she also said it has to be a combination of social and medical aspects. She said the parents received some training when the child was placed into the hospital.

---

[4] DCS referrals are confidential, so the actual source of the referral will not be mentioned.

Ultimately, VanHooser said that the social ills that played a part in the FTT of the child were probably not addressed prior to the child being taken into state custody.

On April 28, 2000, the child was seen at Sewanee hospital, primarily by Dr. Amy Evans, who received the referral from DCS. Evans, a pediatrician, testified that DCS referred the child to her because the child was severely underweight, had poor growth, and was failing to thrive. On April 28, according to Dr. Evans, the child weighed 8 pounds, 8 ounces, which was the average weight for a three-month old, but in the fifth percentile for this child. Additionally, the length of the child was average for a two-month old, but in the fifth percentile for this child's age. Dr. Evans said she met with both parents who told her that the child was vomiting on a frequent basis. The parents told her they tried different formulas, including Isomil, a soy formula. Dr. Evans diagnosed gastroesophageal reflux ("GER"). She conducted a physical exam of the child, describing her as "emaciated, severely undernourished, and with no expression on her face, very delayed, developmentally delayed." She also said the child was not clean.

Dr. Evans further testified that she had discussions with the defendant about feeding the child. After learning from the defendant that the defendant was feeding the child too many ounces of formula at each feeding, Dr. Evans instructed her to feed fewer ounces, but at more frequent intervals. Ultimately Dr. Evans recommended the formula Alimentum, an alimental formula that is easier for babies to digest. She gave the defendants a prescription for Alimentum so that they could get the Alimentum through the WIC program. Dr. Evans said she went over proper feeding techniques with the defendants but that while the father interacted with the child, the mother seemed distant.

Dr. Evans testified that if the condition of this child continued unchecked by medical personnel, it was a potentially fatal problem. She described the differences between organic FTT and inorganic FTT, and concluded that the child was suffering nutritional neglect and that lab tests she ran showed no evidence of organic FTT.

On May 3, 2000, Dr. Evans testified that the child weighed 8 pounds, 12.4 ounces and was gaining one ounce a day, although she would have preferred the child gain two to three ounces a day. Dr. Evans said the parents were pleased that the child was gaining weight and not vomiting while taking the Alimentum but were not very communicative about the feeding schedule they were using with the child. Dr. Evans, being unsatisfied with the weight gain in the child, admitted the child to the hospital on May 9, 2000, when the child weighed 8 pounds, 14.8 ounces, or about one-sixth the amount of weight gain Dr. Evans would have preferred. Dr. Evans said the child still appeared malnourished. She stated that while hospitalized, the child gained weight to her satisfaction. The child was placed into state custody on May 15, 2000. Throughout the course of the initial hospitalization and the early days of the child being in state custody, Dr. Evans testified that she was satisfied with the weight gain and progress of the child. She testified that on July 11, 2000, the child weighed 17 pounds, 7 ounces, which was the fiftieth percentile for the child's age. The child's weight gain was normal up to the time of the trial.

In sum, Dr. Evans testified that the child was malnourished when she first saw her. She attempted to help the defendants with feeding and parenting skills in an effort to get the child healthy. Dr. Evans determined that the formula Alimentum was tolerable by the child and that the vomiting episodes stopped once the child was taking Alimentum. Despite her discussions with the defendants as to feeding the child, Dr. Evans was dissatisfied with the weight gain progress made by the child while the defendants were responsible for feeding her. That led to Dr. Evans' decision to hospitalize the child. Once hospitalized and under the care of the professional medical staff, the child began to thrive. Dr. Evans concluded the child had suffered from severe malnutrition.

During the child's hospitalization, other medical personnel testified to her condition. Mary Ann Rollins Gifford, a licensed practical nurse ("LPN") at Sewanee testified that the child was very small, underweight, and dirty. She said that the defendant did not interact with care and love to the child. She also said that while the child was hospitalized, both parents left the hospital to take care of personal things. She admitted that she had never heard of the formula Alimentum.

Cheryl Brewer, an LPN at Sewanee, testified that the child had no vomiting problems while being fed Alimentum. She said when she heard the child crying in her baby swing, the parents were not attending to the child, but were lying in bed. She said that both parents left the hospital once in order to attend to a sick dog. According to Nurse Brewer, the parents were not interested in helping her bathe and feed the child, despite her offering them that opportunity. She said that the co-defendant seemed willing to learn about some feeding techniques.

Dr. Evans testified on cross-examination that the child appeared healthy at the time of the trial, but was malnourished during the earlier episodes. She said the child is still at risk for learning disabilities and emotional problems, although she admitted that there were no objective findings of any physical or mental injury at the time.

Dr. Evans stated she felt that the parents were going through a process of trying to find out why the child was vomiting, even if they did not take the child to the doctor. She stated, however, that the process of trying new formulas and milk should have taken a *few weeks*. She further said that many of the feeding problems the child was suffering from would not have been understood by the defendant without more education. She said that maternal depression could be a factor in FTT. Dr. Evans said she did not think the intention of the parents was to starve the child. Dr. Evans also testified that the formula Alimentum was a "rare bird," and it would be fair to say the defendants were ignorant about it. She said that if the parents made a mistake, it was in the feeding techniques they used, but what alarmed her was the severity of the malnutrition and how long it took the defendants to bring the child to a doctor. She also felt the defendants were not forthcoming enough in giving her a medical history of the child. She said the defendants were not ignorant people, although even bright people did not know of Alimentum.

On re-direct examination, Dr. Evans testified that the expected parental reaction to a child vomiting over a period of time would be to seek medical attention. She said the parents seemed knowledgeable about feeding during the first few weeks of life and that they were bright people that

understood directions and proper procedures. Dr. Evans' general summation was that, based on the child's particular condition, the parents should have seen a doctor sooner.

On May 12, 2000, the child was placed in foster care with Peggy Durham, a foster parent. Ms. Durham testified that the child, who was just short of being six months old, looked like a newborn. She said that she followed the feeding instructions of Dr. Evans and that the child already weighed 17 pounds by June and after about another five months with her, the child weighed 24 pounds. Ms. Durham said she had no trouble getting the child to eat and that the child may have spit up two times, but never threw up.

**Defense**

Cynthia Cox, a social worker that does contract work for DCS, testified that on May 2, 2000, she received a referral from DCS to work with the defendants. She said that from the information she had, DCS did not believe the defendants knew some of the things they needed to know about child care.

DCS placed the child with Robert Goodman, the co-defendant's father, some time after placing the child into foster care. Robert Goodman had custody at the time of the trial. He testified that the child was "perfectly normal." He said he cannot detect any present effect from her past malnourishment.

The co-defendant, James Goodman, did testify at trial. He said that after the birth, he and the defendant took their daughter to Dr. Ghrearing due to her jaundice condition and her thrush. He said the next time his daughter received treatment of any kind was when she received her immunizations, and they took her for those shots because they knew she needed them. He testified that he has a vision problem that prevents him from driving and that arranging transportation is, therefore, stressful.

Goodman testified that their daughter appeared to them to be a normal child. He said she cooed, smiled, and even screamed joyously when he would tickle her. He said that he thought in early December, the child would throw up after just about every feeding. According to Goodman, Dr. Ghearing suggested to them that all formulas were alike, so the defendant and he tried changing formulas, even trying goat's milk, but that after a while the child would start throwing up again. He said the first time they were aware of a malnutrition problem was when Kathy Lyle informed them on April 6, 2000, at the Marion County Health Department. He said that because he saw the child every day and was so close to the situation, he did not notice the problem. He thought his daughter would "catch up." While at the health department, Goodman said he did not detect a sense of urgency about the health of his daughter. He said that after getting the immunizations at the Marion County Health Department, they tried to make an appointment to see Dr. Fox, but Dr. Fox's office told them they did not take TennCare. Goodman said they did not have $200 for the office visit, so the next doctor they saw was Dr. Evans. He did not sense any urgency from the DCS worker, Wanda VanHooser, nor any urgency from Dr. Evans until May 9, 2000, when Dr. Evans told him that the

child was at serious risk and might die if the condition continued. Goodman said that as soon as the Alimentum was given to his daughter, the vomiting stopped, but that before seeing Dr. Evans he had not heard of Alimentum.[5]

Goodman said that prior to seeing Dr. Evans, he did not realize the importance of nurturing but that they tried to follow Dr. Evans' feeding instructions, and he believes he did everything he could in cooperating with Dr. Evans. He said he did attend parenting classes and, before those classes, he was unaware of the trouble signs as applied to his daughter. He said there was no inkling of DCS removing the child from their care until they took her on May 12, 2000.

On cross-examination, Goodman said he was computer literate, even meeting his wife through the internet. He said they lived close to his wife's family so they could get assistance with transportation. He admitted he knew that you had to feed a baby and that you had to take babies to the doctor from time to time. He said that when the child had jaundice, he did know enough to take the baby to the doctor but that with the vomiting problem, he did not know, because that subject never came up during the early visit with Dr. Ghearing. He said he never told Nurse Lyle at the Marion Health Department that they did not have enough money for food, only that the child was having trouble getting food down. He admitted not seeking another doctor after Dr. Fox turned down their referral.

Goodman admitted that his visit to Dr. Respess was for himself, to get an Albutrol inhaler, and that the child was not officially seen until the immunizations on April 6, 2000. Goodman said they were able to get transportation for his visit to Dr. Respess. He said his daughter's lack of weight gain did not concern him. Goodman admitted that he owned some animals and that he did shop for them, even traveling to Chattanooga for specialty items. He said they had insurance and shopped at Wal-Mart. He said they tried to get his daughter's shots but the facility they went to, the Grundy County Health Department, was closed. He admitted they started the process of seeking medical attention for their daughter in January, although she was not seen until April. He said he was not concerned when Dr. Evans described the child's condition as "emaciated," because the doctor said she wanted to try a new formula.

Goodman said that during the child's hospitalization, there were times when he and the defendant left the hospital, such as to treat his sick dog. He said that while he was aware of Dr. Evans' instructions about nurturing the child, he still left her with the nurses and did not participate in feedings and the like, because the nurses did not ask him to.

The defendant testified on her own behalf. She said she initially breast fed the child and then switched to formula, but the child vomited the formula. She said she tried different formulas, including Isomil, Enfamil with low iron, Enfamil with high iron, and more. She even tried goat's milk, but that did not really address the spitting up. She said they did all go see Dr. Respess and that

---

[5] Alimentum is mentioned in the package of brochures on child care the defendants received.

even though the visit was for the co-defendant, Dr. Respess did see the child. Furthermore, the defendant said the nurse at the office saw the child and was not alarmed by the child's appearance.

After taking the child to the Marion County Health Department, the defendant testified that they tried to arrange a visit with Dr. Fox, but were unable to see him because he did not take Tenn Care. She said that while the nurse at Marion County Health commented that the child was small, the nurse did not point out any problems out of the ordinary.

The defendant testified that DCS worker Wanda VanHooser's visit to their home led to a scheduled visit at the DCS office. That visit resulted in the referral to Dr. Evans. She said Dr. Evans reviewed proper feeding techniques and also started the child on Alimentum. Prior to that visit, the defendant said she had never heard of Alimentum. The defendant said that after the third visit with Dr. Evans, Dr. Evans wanted the child to be hospitalized. The defendant said that the co-defendant and she were instructed to watch and let the hospital staff do the feeding and the like of the child. The defendant admitted to leaving the child at the hospital during the stay but said she felt fine with that because the child was safe with the staff and she had some personal things to attend to.

She said she had no indication that DCS was going to remove the child from her custody but that it was traumatic when it happened. She said DCS only sent one person to help her and that she had not attended any parenting classes before the removal. Generally, the defendant claims she did not receive enough help from DCS in addressing her problems in caring for the child.

On cross-examination, the defendant said she did understand the importance of the baby getting adequate nutrition. She said that after switching from breast feeding to formula, they picked up the formula from Wal-Mart, although she did not recall seeing Alimentum at the Wal-Mart. She said it was important to give a medical history to a doctor. She said she did discuss the child's vomiting problem with Dr. Ghearing, and Dr. Ghearing asked her about projectiles in the vomit. She said she told him that it was more like excessive dribbling, and the doctor told her that was perfectly normal. She had no explanation why Dr. Ghearing's office had no notes to that affect. The defendant said she was aware that the projectile vomiting was not a normal thing for a child, but they were told to find something that agreed with the child.

The defendant admitted that between November 18, 1999, and April 6, 2000, the child did not see a doctor for purposes of treatment, although she said they attempted to get her to a doctor. She admitted that she worked at Genesis Center, which was about five or ten minutes from Grandview Hospital, and that Dr. Ghearing's office was about fifteen minutes away. She said that she had the child with her on occasion when she went to Genesis to pick up her paychecks. She said she was concerned enough about the child's projectile vomiting that she tried different formulas to address the problem, and she was aware the child was not eating right and was underweight, but that she never took the child to the doctor on her way to Genesis.

The defendant testified that she owned some horses and dogs. She said she certainly made sure the dogs, Borzois, got their shots and veterinary attention. She admitted that when her husband

needed an inhaler, they were able to see a doctor; that when she was having complications during her pregnancy, she was able to see a doctor; that when her dog got shot, she was able to get it to a doctor; but that when her daughter was projectile vomiting and sick, she was unable to get her to a doctor, making just the one attempt to take her to the closed Grundy County Health Department.

The jury convicted the defendants of child abuse and neglect of a child under six years of age.

**Analysis**

A violation of Tennessee Code Annotated section 39-15-401 may be established by either inflicting injury upon a child or by neglecting the child. State v. Hodges, 7 S.W.3d 609, 622 (Tenn. Crim. App. 1998). Viewing the evidence in the light most favorable to the State, as we are required to do, we conclude there was ample evidence for the jury to determine that the defendant knowingly neglected her child and that the child's health was adversely affected over the four-month period between doctor visits.

Foremost is the number of medical personnel that testified concerning the child's health. Kathy Lyle, with the Marion County Health Department, noticed the child was very small, sick, and underweight. DCS worker Wanda VanHooser described the child as sick, not clean, and like a skeleton. Importantly, Dr. Evans, a pediatrician, diagnosed the child as failing to thrive, suffering from nutritional neglect, and suffering a life threatening condition if it went unchecked. Additionally, Dr. Evans testified that as a result of the FTT, the child ran the risk of suffering emotional and physical problems in the future. Mary Ann Rollins Gifford, a licensed practical nurse, described the child as very small, underweight, and dirty. The testimony of the aforementioned medical personnel, clearly, was sufficient to allow a rational jury to find the child's health and welfare was adversely affected.

Even if we were to accept the argument that the child, while under the care of the State and, subsequently, the paternal grandparents, showed no permanent adverse affect, that would still not vitiate the adverse condition the child suffered during the period of actual neglect. Moreover, as our supreme court determined in State v. Adams, "[n]eglect through a refusal to provide medical or hospital lasts as long as such care is not provided, and a child continues to be in 'a situation of want' as long as the morals or health of the child is endangered." 24 S.W. 3d 289, 296 (Tenn. 2000). The conclusion that while the child in the instant case was not being provided medical care and was therefore in a "situation of want" was adverse to the child is inescapable.

This leads us to the determination of whether there was knowing neglect on behalf of the defendant. The defendant argues that even if there was neglect, such neglect was not knowing, because it was a result of a mistake on her part in not knowing about the formula Alimentum. Ignorance or mistake of fact is a defense if such ignorance or mistake negates the culpable mental state of the charged offense. Tenn. Code Ann. § 39-11-502(a). In this case, that culpable mental state is "knowing." Had this case been decided solely upon whether the defendant knew of Alimentum, the defendant would be correct, that she lacked knowledge. However, there is ample

evidence throughout the record that the knowing neglect was not in the failure to discover and use Alimentum but in the failure to bring the child to a doctor for such a lengthy time period. The defendant's ignorance as to Alimentum does nothing to negate her knowing failure, in light of the information she had, to seek medical help.

A rational jury could have determined the defendant knew that not taking the child to the doctor for such a lengthy period was neglectful, based on a number of reasons, including: (1) The defendant was bright enough to be computer literate to the point she met her husband through the internet; and (2) The defendant knew enough to take the child to the doctor at the early infant stages in November, 1999, and, while at the doctor, received an abundance of advice, both oral and written, about caring for a child, including advice about contacting the doctor if there is frequent vomiting. While the defendant does not characterize the child as appearing sick, there was such an abundance of evidence that medical personnel thought the child appeared malnourished that the jury easily could have inferred the defendant knew something was wrong with the child. The defendant, by her own admission, knew enough to have her animals cared for, yet in the appearance of a sick and vomiting child she made only one real attempt in over four months to have the child seen by professional medical personnel. The totality of the situation was more than adequate to allow a jury to find beyond a reasonable doubt that this sick, vomiting child was being knowingly neglected in the failure to take her to the doctor for so long. Common sense leads us to conclude that this defendant, a mother, was bright enough to know that her sickly, malnourished daughter needed to seek medical attention.

The defendant, as a parent, had a duty to care for the child. Tenn. Code Ann. §§ 34-1-102 (a)-(c) (2002). She knowingly neglected that duty by failing to obtain medical care. At exactly what point the knowing failure to obtain medical treatment becomes child neglect as defined in Tennessee Code Annotated section 39-15-401 is not clear, but must be determined on a case-by-case basis. A few examples should be illustrative.

In State v. Kathryn Lee Adler, No. W2001-00951-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 141 (Tenn. Crim. App. at Jackson, Feb. 19, 2002) (rehearing denied Sept. 9, 2002), a child suffered accidental, yet serious, burns in a bathtub. The defendant did not seek medical attention for the burns for 72 hours, resulting in harm to the child. This Court affirmed that the failure to obtain medical attention for that period of time, faced with the burn injuries evident on the extremities of the child, was knowing neglect.

In State v. Hodges, a child victim was severely beaten, with visible injuries, including lacerations of the nostrils and lips and abrasions on the hands and arms. 7 S.W.3d 609 (Tenn. Crim. App. 1998). The defendant, who did not necessarily inflict the injuries, was left as the sole caretaker of the child victim, his stepchild, for an entire day. This Court affirmed his felony murder conviction and, importantly for the instant case, stated, "[D]efendant knew this victim was in serious medical trouble. Defendant took no action to provide medical attention for the child he considered his own . . . ."

We find the evidence sufficient to permit the jury to convict him . . . upon a theory that Defendant knowingly neglected her as to adversely affect her health and welfare." Id. at 623 (*citing with approval* State v. Bordis, 905 S.W.2d 214, 225-26 (Tenn. Crim. App.), where this Court found evidence to convict of second degree murder where the deterioration [of the victim] was evident and the need for medical attention apparent, yet the defendant elected not to nourish or seek medical attention).

In Hodges, this Court concluded that 72 hours without medical attention was knowing neglect when the manifestation of injury was water-produced burns. It is a stretch beyond credulity to think that when that manifestation is in the form of vomiting, malnourishment, and emaciation, that a failure to obtain medical attention for four and one-half months was not knowing neglect.

A rational jury could have determined that the defendant knew the child was sick, based on the constant vomiting and sickly appearance of her daughter and the information available to the defendant. The defendant had access to nearby medical facilities and, through her husband and through TennCare, had the financial ability to obtain medical treatment. Yet, other than a feeble effort to visit the Grundy County Health Department, she made no real attempt to take her daughter to the doctor.

### Conclusion

We have little doubt that the defendant wanted to help her daughter, evidenced by her attempts at switching formulas as the child remained sick. However, no intentional harmful behavior was needed in order to be convicted of child abuse, only knowing neglect. The evidence is sufficient to support the conclusion that the defendant knew her daughter needed medial attention, yet, for whatever inexplicable reason, gave little to no effort to obtain it. We can forgive her mistake in being unaware of the formula, Alimentum, but we cannot ignore her failure to simply take her child to the doctor. Accordingly, we affirm the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE

-14-