# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

## AT KNOXVILLE

## APRIL 1999 SESSION

FILED

October 8, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| **STATE OF TENNESSEE**, | * | C.C.A. NO. 03C01-9803-CR-00093 |
| Appellee, | * | SULLIVAN COUNTY |
| v. | * | Hon. Phyllis H. Miller, Judge |
| **JIMMY A. SALYER**, | * | (Attempted Second Degree Murder) |
| Appellant. | * | |

For Appellant:

Gerald L. Gulley, Jr.
P.O. Box 1708
Knoxville, TN 37901-1708

Terry L. Jordan
P.O. Box 839
Blountville, TN 37617

For Appellee:

John Knox Walkup
Attorney General and Reporter
450 James Robertson Parkway
Nashville, TN 37243-0493

R. Stephen Jobe
Assistant Attorney General
Criminal Justice Division
425 Fifth Avenue North
Nashville, TN 37243-0493

Barry Staubus and Lisa Crockett
Assistant District Attorneys General
Blountville, TN 37617

OPINION FILED: _____

AFFIRMED

NORMA MCGEE OGLE, JUDGE

## OPINION

On November 19, 1997, the appellant, Jimmy A. Salyer, was convicted by a jury in the Sullivan County Criminal Court of attempted second degree murder, a class B Felony. On January 9, 1998, the trial court sentenced the appellant as a Range I standard offender to an effective sentence of ten years incarceration in the Tennessee Department of Correction.

In this appeal as of right, the appellant presents the following issues for our review:

(I) Whether the evidence is sufficient to sustain the appellant's conviction of attempted second degree murder;

(II) Whether the trial court erred by sentencing the appellant to a term of ten (10) years imprisonment;

(III) Whether the trial court erred by refusing to give the defendant credit for jail time already served;[1] and

(IV) Whether the trial court erred by failing to grant the appellant a sentencing alternative to incarceration.

Following a review of the record and the parties' briefs, we affirm the judgment of the trial court.

## I. Factual Background

The offense in this case occurred as a result of a shooting on September 12, 1996, near the residence of the victim, Gary Alvis. On the morning of the shooting, the appellant telephoned Alvis and advised him to leave the appellant's girlfriend alone. Alvis replied that he was not "fooling" with the appellant's girlfriend, Judy Walkey. Although Walkey and Alvis had dated in 1992 and 1993, they no longer had a relationship. Alvis testified that approximately two weeks before this call, the appellant had left a message on Alvis' answering machine stating, "Well, I'm going to kill you because you will not help me anymore."

---

[1] The appellant contends that the trial court erred by failing to give him credit for jail time served prior to his conviction. The original judgment entered by the trial court does not reflect any pretrial jail credit for time served prior to sentencing. Pursuant to the amended judgment filed December 22, 1998, which correctly reflects pretrial jail credit from 9/12/96 to 01/09/98, this issue is moot.

On the afternoon of the shooting, at approximately 4:00 p.m., Alvis was working in his lawn when he noticed the appellant's yellow Honda CRX automobile parked across the street at the home of Rita Lockhart Evans. Alvis also noticed that the appellant's car was facing in the direction of the dead-end of the street and that the appellant was sitting in the car staring at him. Alvis walked toward the car and asked the appellant, "Jim, do you have something to say to me?" The appellant replied, "yeah," and showed him a small pistol and a chain. Alvis then turned and proceeded up his driveway.

When Alvis had gone approximately two-thirds of the way up his driveway, he heard a gunshot. Alvis testified that when he heard the shot he "automatically froze," fearing more gunshots would be fired at him. When questioned as to why he did not flee inside his residence, Alvis explained that the appellant knew the layout of his home, and knew he did not own a gun. Moreover, Alvis' girlfriend was inside the residence and he did not want to place her in danger.

After hearing the gunshot, Alvis turned and saw that the appellant had turned around at the dead-end of the street and was driving back down the street toward Alvis. Alvis's neighbor was having his roof repaired and construction trucks were parked along the street. As Alvis ran toward the trucks in an effort to have the drivers block the street, the appellant drove down the street, stood, and fired a pistol five times from the sunroof of the car. When the appellant reached Alvis, he swerved his car toward Alvis and struck his right leg. Alvis, who was holding a weed eater, "swung" the weed eater at the sunroof in an effort to knock the pistol from the appellant's hand. The weed eater struck the car's windshield, which shattered.

The appellant stopped his car and reloaded the pistol. Alvis sought refuge behind his girlfriend's car, a Chevette, which was parked on the street in front of his residence. As the appellant left his car and approached the Chevette, Alvis threw the weed eater at the appellant, striking him on the head. As the appellant began shooting at Alvis, Alvis moved around the car in an attempt to avoid

3

the shots. While the two men were moving around the car, the appellant fired five additional shots. As Alvis attempted to avoid a shot, his leg collapsed and a shot struck him in the side. The appellant then entered his car and fled the scene.

Alvis testified that the bullet wound collapsed his lung and that he continues to suffer physical pain from the bullet, which is lodged in his body cavity. Alvis also suffered nerve damage and injury to his arm and leg from the collision with the appellant's car. Furthermore, Alvis testified that this episode has affected him mentally and has left him afraid to be out in groups of people.

On cross-examination, Alvis testified that he did not consider the telephone message two weeks prior to the shooting to be a threat. Moreover, the appellant sounded normal on that occasion. However, Alvis testified that he had considered the telephone conversation with the appellant on the morning of the shooting to be threatening.

Rita Lockhart Evans testified that she lived across the street from Alvis. Evans knew the appellant and recalled that on the afternoon of September 12, 1996, the appellant visited her house. The appellant was driving a yellow Honda CRX automobile which he parked in her yard. According to Evans, on that afternoon the appellant seemed "very upset" and "mad at Gary." The appellant showed Evans a pistol and a length of chain and told Evans that he was going to kill Alvis. Evans became upset and threw the chain underneath some nearby bushes. The appellant retrieved the length of chain and returned to his car.

On cross-examination, Evans testified that at this point she went into shock and, as a result, does not completely recall all the events that transpired. Evans did remember seeing the appellant driving down the street while shooting at Alvis, who was working in his yard. While witnessing these events, she screamed, "Gary, get down, he's going to kill you." Evans also admitted that she regularly consumes a "beer or two" in the mornings.

Scott Culbertson testified that he was Alvis' neighbor. He lived two houses up the street from Alvis on the opposite side of the street. On September 12, 1996, workers were repairing the roof of his house. At approximately 4:00 p.m., Culbertson heard gunshots and looked outside. He testified that the gunshot sounds were distinct from the hammering on the roof. Culbertson walked to a nearby window, looked outside, and observed Alvis squatting down at the left front corner of a car. At the right rear corner of the car, he observed the appellant pointing a gun at Alvis. The appellant was standing on his tiptoes in an effort to get a clear shot over the car at Alvis. Alvis stood up and threw a weed eater which struck the appellant in the head or shoulder. Culbertson then observed the appellant fire three or four shots over the car at Alvis. When the shooting ended, the appellant entered his car and drove away while Alvis proceeded to his residence.

Next, the State presented the testimony of Jack Bowen who was also a neighbor of Alvis. On September 12, 1996, at approximately 4:00 p.m., Bowen heard a gunshot. Bowen observed Alvis standing in his driveway and also saw a yellow car matching the description of the appellant's car driving quickly toward the dead-end of the street. Alvis proceeded up the street toward the other end of his lot with a weed eater. Once at the dead-end, the car hesitated and then came rapidly down the street toward Alvis, who was standing behind a bush. As the appellant drove by, Alvis swung the weed eater and hit the yellow car. The car proceeded another ten to thirty feet and stopped. According to Bowen, the appellant exited the car and began shooting at Alvis who ducked behind a nearby parked car. The appellant fired five shots at Alvis, who then threw the weed eater at the appellant. Bowen further testified that after the appellant fired the last shot, he entered his car and left the scene while Alvis returned to his residence. Bowen recalled that he did not know that Alvis had been shot until later.

Dennis Higgins, an officer with the Washington County Sheriff's Department, testified that on September 12, 1996, at approximately 6:15 p.m., he responded to a call involving the appellant at the Meadowbrook trailer park. When Higgins arrived, the appellant and Bobby Benfield were

5

leaning against a black truck. Higgins noticed that the appellant had a cut on his head. The appellant's car, with duct tape on its shattered windshield, was parked next to the truck. The appellant was placed under arrest and advised of his <u>Miranda</u> rights. The appellant was "calm" and "cooperative" and appeared to understand his <u>Miranda</u> rights. Higgins also testified that he discovered the weapon used in the shooting along with additional ammunition under a jacket in the passenger seat of the truck.

Additionally, Johnny Murray of the Sullivan County Sheriff's Department testified that at approximately 6:00 p.m. on September 12, 1996, he responded to a call at the Meadowbrook trailer park. Murray observed a blood-stained shirt in the appellant's car. Moreover, Murray identified the gun recovered from the truck as a .22 caliber six shot revolver and also identified the .22 caliber ammunition case recovered from the truck. Murray recalled that the gun contained five spent shells and one live round of ammunition, indicating that the weapon had been fired five times. According to Murray, eighteen rounds of ammunition were missing from the ammunition case. The appellant was "nervous" but "mild mannered," appeared to understand what was happening, and was "cooperative." In fact, Murray and the appellant had an intelligible conversation regarding some common acquaintances.

Finally, the State offered the testimony of Chad Able, a resident of the Meadowbrook trailer park. In the afternoon of September 12, 1996, the appellant visited Able's home. The appellant told Able that he was "in trouble" and needed to speak with Able's father-in-law, Bobby Benfield. When Able asked the appellant what had happened, the appellant replied that he had been in a dispute with someone and that the individual had shattered his windshield and struck him in the head with a weed eater. The appellant further explained that he had shot the individual and he showed Able some spent shell casings, but he did not show Able the pistol used in the shooting. According to Able, the appellant proceeded to Benfield's residence, and the police arrived approximately twenty to thirty minutes later.

6

The appellant offered the testimony of Bobby Benfield. Benfield testified that he had known the appellant for sixteen years. On September 12, 1996, Benfield was in his trailer at the Meadowbrook trailer park when his son-in-law notified him that the appellant needed to talk with him. Benfield went outside and was standing beside his truck talking with the appellant when the police arrived at the trailer park. He stated that, prior to the arrival of the police, he had not seen the appellant with a weapon or gun. Benfield gave the police permission to search his truck. The search revealed a pistol in the truck, which Benfield stated did not belong to him and had not been in the truck on the previous day.

Next, Jerry Salyer, the appellant's brother, testified that he visited the appellant in early September 1996 at the Woodbridge Mental Hospital where the appellant was undergoing treatment. During Salyer's visit on September 2, 1996, he had a conversation with the appellant and the appellant was "irrational". The hospital released the appellant that same day.

The appellant testified on his own behalf. He stated that on the day of the shooting, he was "real depressed" and "nervous." He conceded that he had called Alvis on the morning of September 12, 1996, to tell him to stop aggravating his girlfriend. The appellant claimed that he placed the call at his girlfriend's request. The appellant admitted that on the day of the shooting he traveled to the home of Rita Lockhart Evans at approximately 4:00 p.m. However, in contrast to Alvis' version of events, the appellant testified that, as he was leaving Evans' residence, Alvis proceeded toward him holding a weed eater "like a baseball bat," and asked, "Have you got something to say to me?" The appellant replied, "The only thing I've got to say to you, Gary, is leave Judy [Walkey] alone."

Further, the appellant testified that he pulled out a pistol and fired a warning shot into the ground only to let Alvis know that he could defend himself. Alvis stepped back and the appellant drove his car to the dead-end of the street to turn around. Once he had driven to the dead-end, he

7

observed Alvis behind some bushes, standing on a short block wall adjacent to the street. According to the appellant, Alvis was waving the weed eater. The appellant hesitated a moment to decide how he could leave without any more trouble. Because of the construction trucks parked on the side of the street, it was not possible for the appellant to leave without driving near Alvis. The appellant decided that the best approach would be to drive by Alvis as quickly as possible. When the appellant reached the bushes where Alvis was standing, Alvis swung the weed eater at his car and shattered the windshield. The appellant stopped his car because he had glass in his eyes and could no longer see to drive.

Additionally, the appellant testified that as he was exiting the car, Alvis threw the weed eater at him, striking him on the head. The appellant explained that he was bleeding heavily and could not see. In order to keep Alvis away until he could clear his eyes of glass and blood, the appellant began shooting his pistol upward, not at Alvis. The appellant stated that he fired a total of five shots, including the earlier warning shot.[2] The appellant left the scene, washed the glass and blood off his head, packed a suitcase, taped his shattered windshield, and proceeded to the Meadowbrook trailer park where he had planned to stay with friends.

In further testimony, the appellant stated that he bought the pistol shortly before the shooting for self-protection. He also accounted for the eighteen missing shells in the ammunition case by explaining that he had fired twelve shells as practice on the Wednesday before the shooting. The appellant admitted that he had placed the pistol and ammunition in Benfield's truck when he first arrived at the trailer park.

On cross examination, the appellant denied that he fired any shots at Alvis when Alvis was behind his girlfriend's car, but offered no explanation for the

---

[2]The appellant's testimony indicates that he did not fire any shots from the sunroof of his car.

8

scratches located on the car following the shooting. Moreover, the appellant claimed he did not aim the pistol at Alvis at any time. The appellant explained Alvis' injury by stating, "Apparently he got in the way of one of the bullets."

## II. Analysis

**Sufficiency of the Evidence**

The appellant contends that the evidence is not sufficient to sustain his conviction of attempted second degree murder. In Tennessee, appellate courts accord considerable weight to the verdict of a jury in a criminal trial. In essence, a jury conviction removes the presumption of the defendant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that "no reasonable trier of fact" could have found the essential elements of the offenses beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The grand jury indicted the appellant for the attempted first degree murder of Gary Alvis. The jury found the appellant guilty of the lesser included offense of attempted second degree murder pursuant to an indictment charging that the appellant:

> did unlawfully, feloniously, knowingly, intentionally, and with premeditation attempt to kill another, to wit: Gary Alvis, by firing several shots from a R.G. model .22 caliber six (6) shot revolver at

9

him with one shot striking him in the side. . . .

With respect to the appellant's conviction of attempted second degree murder, the applicable statute provides:

(a) Second degree murder is: (1) A knowing killing of another. . . .

Tenn. Code Ann. § 39-13-210(a)(1) (1997). With regard to the culpable mental state, the applicable statute instructs:

"Knowing" refers to a person who acts knowingly with respect to the conduct or to the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause death.

Tenn. Code Ann. § 39-11-302(b) (1997). Moreover, criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

(1) Intentionally engages in action or causes a result that would constitute an offense if the circumstances surrounding the conduct were as the person believes them to be;

(2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or

(3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a) (1997).

We conclude that the State adduced ample evidence from which a rational juror could have concluded that the appellant *knowingly* attempted to kill the victim. Construing the evidence in the light most favorable to the State, the record in this case reveals that the appellant made threatening statements to Alvis, including one on the morning of the shooting. Also, moments before the shooting began, the appellant told Evans that he intended to kill Alvis. Additionally, witnesses

10

for the State testified that the appellant, armed with a pistol, pursued Alvis around a parked car and repeatedly stood on his tip-toes as he fired to afford a better firing line to Alvis. Therefore, the evidence shows that the appellant attempted to follow through with his threats to kill Alvis. The evidence also shows that the appellant "deliberately aimed a pistol and shot several times at his intended victim," which is sufficient proof to support a conviction for second degree murder. State v. Porter, No. 03C01-9606-CC00238, 1997 WL 661419, at *3 (Tenn. Crim. App. at Knoxville, October 23, 1997).

Regarding the appellant's debilitating mental condition, we note that the issue of whether the appellant "knowingly" attempted to kill his victim is a question of fact for the jury. State v. Elder, 982 S.W.2d 871, 876 (Tenn. Crim. App. 1998). Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact from the character of the assault, the nature of the act, and from all circumstances of the case in evidence. Id. (citing State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993)).

Under Tennessee law, evidence of a mental disease or defect that does not rise to the level of an insanity defense is nevertheless admissible to negate elements of specific intent, including premeditation and deliberation in a first degree murder case. State v. Phipps, 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994). See also State v. Hall, 958 S.W.2d 679, 688-690 (Tenn. 1997), cert. denied, __ U.S. __, 118 S.Ct. 2348 (1998); State v. Abrams, 935 S.W.2d 399, 402 (Tenn. 1996). Again, however, this court may not reweigh or reevaluate the evidence. Pruett, 788 S.W.2d at 561. Accordingly, we must defer to the jury's determination that the appellant was capable of forming the requisite intent if supported by evidence adduced at trial. State v. Perry, No. 01C01-9710-CC-00467, 1999 WL 233522, at *8 (Tenn. Crim. App. at Nashville, April 22, 1999).

11

First, the appellant did not offer any expert psychiatric evidence aimed at negating the requisite mental state. Second, the appellant provided no evidence that he was suffering from mental problems on the day of the offense. Evans testified that the appellant did not appear to be suffering from a mental disability; he was merely "angry." Moreover, the appellant had the presence of mind to flee the scene of the shooting, pack clothes, and travel to a friend's home where he attempted to hide his pistol. Finally, we note that testimony at trial indicated that, shortly after the shooting, the appellant was calm and cooperative with the police, able to engage in an intelligible conversation, and seemed to fully appreciate what he had done when he admitted to Chad Able that he had shot Alvis. The jury obviously rejected the appellant's claims of a debilitating mental condition, determining that the appellant was fully capable of forming the mens rea necessary to commit a knowing killing. Because there is evidence to support their determination, we must defer to the results reached by the trier of fact.

Furthermore, the appellant's contention that he was acting under the heat of passion is not supported by this record. The witnesses for the State testified that the appellant, apparently unprovoked, repeatedly aimed his pistol and shot at Alvis while they both moved around the parked car. Moreover, the State's witnesses testified that, at the time the appellant shot Alvis, Alvis was not armed with the weed eater. "When the evidence is conflicting, the jury must resolve these conflicts, under proper instructions, and decide whether the homicide is murder or manslaughter." State v.Zandi, No. 02C01-9703-CC-00122, 1998 WL 12672, at *3 (Tenn. Crim. App. at Jackson, January 15, 1998). Here, the trial court provided instructions on attempted voluntary manslaughter. The jury rejected that alternative and concluded that the appellant attempted a knowing killing and thus was guilty of attempted second degree murder. Again, this court may not reweigh the evidence

12

nor substitute its own view for that properly reached by the trier of fact. The evidence is sufficient for a rational jury to conclude beyond a reasonable doubt that the appellant knowingly attempted to kill Gary Alvis. This issue is without merit.

**Sentencing**

The appellant contends that the trial court erred by sentencing the appellant to a term of ten (10) years imprisonment. Specifically, the appellant asserts that the trial court erred by: (1) imposing an excessive sentence; and (2) failing to grant the appellant's request for probation; or (3) failing to sentence the appellant to the community corrections program. We disagree.

**1. Excessive Sentence**

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (1997). This presumption of correctness is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). The burden is upon the appellant to demonstrate the impropriety of the sentence. State v. Wilkerson, 905 S.W.2d 933, 934 (Tenn. 1995).

Our review of the appellant's sentences requires an analysis of (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to sentencing alternatives; (4) the nature and characteristics of the offenses; (5) any mitigating or enhancement factors; (6) any statements made by the appellant on his own behalf; and (7) the appellant's potential for rehabilitation or treatment. Tenn. Code Ann. § 40-35-102, -103, and -210 (1997).

The presumptive sentence for Class B, C, D, and E felonies is the minimum sentence

13

in the range if there are no enhancement or mitigating factors. Tenn. Code Ann. § 40-35-210 (1997). If the trial court finds that there are enhancement or mitigating factors, the court must start at the minimum sentence in the range, enhance the sentence within the range as appropriate for the enhancement factors, and then reduce the sentence within the range as appropriate for the mitigating factors. Id. The weight given to any existing factor is left to the trial court's discretion so long as the trial court complies with the purposes and principles of sentencing and the court's findings are adequately supported by the record. State v. Shropshire, 874 S.W.2d 634, 642 (Tenn. Crim. App. 1993). See also State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In light of the sentencing proceedings and the trial court's consideration of sentencing principles and all relevant facts and circumstances, we apply a presumption of correctness in conducting our de novo review of the appellant's sentence. Tenn. Code Ann. § 40-35-401(d).

Attempted second degree murder is a class B felony. Tenn. Code Ann. § 39-12-107(a) (1997); 39-13-210(b). The sentencing range applicable to the appellant for this offense is eight to twelve years. Tenn. Code Ann. § 40-35-112(a)(2) (1997). The trial court sentenced the appellant as a Range I standard offender to a mid-range sentence of ten (10) years for the attempted second degree murder.

The trial court found four enhancement factors: the appellant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range; the appellant possessed or employed a firearm during the commission of the offense; the appellant had no hesitation about committing a crime when the risk to human life was high; and during the commission of the felony, the appellant willfully inflicted bodily injury upon another person, or the actions of the appellant resulted in the death of or serious bodily injury to a victim or a person other than the intended victim. Tenn. Code Ann. § 40-35-114(1), (9), (10), and (12) (1997). The trial court placed great weight upon factor (9), that the appellant employed a firearm during the commission of

14

the offense. From these applicable enhancement factors, the trial court enhanced the appellant's sentence from the presumptive minimum sentence of eight years to eleven years.

The trial court then addressed the mitigating factors. After careful consideration, the trial court found one mitigating factor, that the appellant was suffering from a mental condition that reduced his culpability. Tenn. Code Ann. § 40-35-118(8) (1997). However, the trial court stated that it would give this factor very little weight considering the facts of the case and the appellant's background. The trial court found that the appellant was not suffering from any mental disability on the day of the offense despite evidence of a history of mental and emotional problems. In support of this finding, the trial court noted Evans' testimony that, on the day of the offense, the appellant seemed angry instead of mentally unstable. Furthermore, the trial court noted that the appellant had the presence of mind to flee the scene of the shooting, pack his clothes, travel to a friend's residence in another county, and hide the pistol used in the shooting. Based on this one mitigating factor, the trial court reduced the appellant's sentence from eleven to ten years.

The appellant contends that the trial court incorrectly applied several enhancement factors. First, the appellant argues that the trial court incorrectly applied enhancement factor (10), that the appellant had no hesitation about committing a crime when the risk to human life was high. The appellant contends that there was insufficient proof from which to conclude that other individuals were at risk. Again, we cannot agree.

Our court has consistently held that enhancement factor (10) may be applied in situations where individuals other than the victim are in the area and are subject to injury. State v. Sims, 909 S.W.2d 46, 50 (Tenn. Crim. App. 1995). We agree with the trial court that there was sufficient proof to establish that other individuals were at risk.[3] The appellant drove down a residential

---

[3] The appellant's reliance on State v. Baldwin, No. 01C01-9612-CR-00530, 1998 WL 426199, at *7-8 (Tenn. Crim. App. at Nashville, July 29, 1998), is misplaced. Contrary to this case, the record in that case reflects that there were no other people at risk.

street firing a pistol from the sunroof of his car. The appellant then exited his vehicle and continued firing at Alvis as both men moved around a parked car. During the entire episode, the record reflects that the appellant fired a total of eleven shots. Additionally, testimony reflects that at the time of the shooting there were neighbors both inside and outside their homes and construction workers on a nearby roof. Moreover, Alvis' girlfriend was inside his residence, which was only a short distance from the parked car that Alvis hid behind while the appellant shot at him. The appellant's total disregard of the risk of danger to Alvis' neighbors and the construction workers supports the application of enhancement factor (10). This issue is without merit.

Next, the appellant contends that the trial court incorrectly applied enhancement factor (12), that during the commission of the felony, the appellant willfully inflicted bodily injury upon another person, or the actions of the appellant resulted in the death of or serious bodily injury to a victim or a person other than the intended victim. We cannot agree.

The appellant, citing State v. Makoka, 885 S.W.2d 366, 373-74 (Tenn. Crim. App. 1994), argues that this enhancement factor is inapplicable because it is inherent in the offense of attempted murder. In Makoka, this court held that enhancement factor (12) could not be considered based on injuries sustained by the victim of an attempted first or second degree murder on the basis that it would constitute double enhancement. 885 S.W.2d at 374. However, in State v. Freeman, 943 S.W.2d 25, 31-32 (Tenn. Crim. App. 1996), this court disagreed with Makoka on the basis of our supreme court's finding in State v. Trusty, 919 S.W.2d 305, 313 n.7 (Tenn. 1996), that "an attempted murder does not necessarily require either contact with the victim or bodily injury." In Freeman, this court held that "because bodily injury is not an essential element of the offense of attempted second degree murder, the trial court properly enhanced the defendant's sentence for that offense with regard to the victim who was actually wounded." 943 S.W.2d at 32. It is our view that the same reasoning applies in this case. The victim of an attempted second degree murder does not necessarily suffer bodily injury. Accordingly, there is no double enhancement from the application of this factor where

16

the victim does suffer such injuries.  See State v. Harris, 978 S.W.2d 109, 117 (Tenn. Crim. App. 1997); State v. Fields, No. 01C01-9512-CR-00414, 1998 WL 79917, at *10 (Tenn. Crim. App. at Nashville, February 26, 1998), perm to appeal denied, (Tenn. 1998).

The appellant also argues that the trial court erred by rejecting certain mitigating evidence under the general provision of Tenn. Code Ann. § 40-35-113(13) (1997).  Specifically, the appellant points to his "long and stable work history, the minor and relatively recent criminal history, and the appellant's history of mental problems" as proper mitigating factors.  We disagree.

First, the appellant argues that trial court erred by failing to use the appellant's "long and stable work history" as a mitigating factor.  The presentence report states that the appellant was employed at AFG Industries for approximately twenty-five years.  However, the record reflects that at time of the offense the appellant was no longer employed.  This court has previously noted that "[e]very citizen in this state is expected to have a stable work history if the economy permits the citizen to work, the citizen is not disabled, or the citizen is not independently wealthy." State v. Keel, 882 S.W.2d 410, 423 (Tenn. Crim. App. 1994).  We find no abuse of discretion by the trial court in its refusal to apply this mitigating factor.

Next, the appellant argues that trial court erred by failing to use the appellant's "minor and relatively recent criminal behavior" as a mitigating factor.  As the State correctly points out, the appellant is not entitled to mitigation for a *minor* criminal record as opposed to the lack of a criminal record altogether. Keel, 882 S.W.2d at 422-23.  The record reflects that the appellant has a history of criminal behavior; therefore, the trial court's refusal to accept this mitigating factor was not error.

Finally, regarding the appellant's history of mental problems, the record reflects that the trial court did consider his mental health in finding mitigating factor (8) applicable and reducing the sentence from eleven to ten years.  We find no abuse of discretion by the trial court in its refusal to

17

afford additional mitigation. This issue is without merit.

## 2. Probation

The appellant argues that the trial court erred by failing to grant the appellant's request for probation. Specifically, the appellant contends that because the trial court misapplied two enhancement factors and failed to consider certain mitigating factors, the ten (10) year sentence was excessive and a sentence of eight (8) years is appropriate. A defendant who receives a sentence of eight (8) years or less, except for certain offenses, is eligible for probation. Tenn. Code Ann. § 40-35-303(a) (1997). However, in spite of the appellant's arguments, we conclude that the findings of the trial court as to the application of the relevant enhancement and mitigating factors is correct. Therefore, the appellant is not eligible for probation because the trial court justifiably imposed a sentence in excess of eight (8) years. This issue is without merit.

## 3. Community Corrections

The appellant contends that the trial court erred by failing to sentence him to an alternative sentence in a community corrections program. First, we note that the appellant did not specifically request sentencing to a community corrections program at the sentencing hearing. Consequently, the trial court did not specifically address the appellant's eligibility for a community corrections sentence. The trial court did, however, address the appellant's eligibility for probation by stating that the length of the appellant's sentence rendered him ineligible for probation *or other alternative sentencing.* While the trial court's remark was misleading, we find from our de novo review that the record is adequate to support the denial of an alternative sentence under the Community Corrections Act.

Eligibility for the Community Corrections Program is governed by Tenn. Code Ann. § 40-36-106 which states, in relevant part:

> (a) An offender who meets all the following minimum criteria shall be considered eligible for punishment in the community under the provisions of this chapter: . . .
>
> (3) Persons who are convicted of nonviolent felony offenses;
>
> (4) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved; . . . .

Tenn. Code Ann. § 40-36-106(a) (1998 Supp.).

We first must determine if the appellant is eligible for a community corrections sentence pursuant to subpart (a). This court has stated that a defendant is eligible for a community corrections under subpart (a) regardless of the length of the sentence. State v. Boston, 938 S.W.2d 435, 438-39 (Tenn. Crim. App. 1996); State v. Crowe, No. 01C01-9503-CC-00064, 1995 WL 392967, at *1-2 (Tenn. Crim. App. at Nashville, July 6, 1995). However, the appellant is not eligible for community corrections under subpart (a) because section (a) (3) excludes individuals convicted of crimes against the person. Attempted second degree murder is a crime against the person. Furthermore, the appellant is not eligible because section (a) (4) excludes individuals convicted of felony offenses in which the use of a weapon was involved. In this case, the appellant used a pistol in the commission of the offense.

An appellant ineligible for community corrections under subpart (a) may, however, be eligible under subpart (c), which creates a "special needs" category of eligibility:

> Felony offenders not otherwise eligible under subsection (a), and who would be usually considered unfit for probation due to histories of chronic alcohol, drug abuse, or mental health problems, but whose special needs are treatable and could be served best in the community

19

> rather than in a correctional institution, may be
> considered eligible for punishment in the community
> under this chapter.

Tenn. Code Ann. § 40-36-106(c) (1998 Supp.). This court has previously held that in order to be eligible for the Community Corrections Program under 40-36-106(c), a defendant must first be statutorily eligible for probation. State v. Grigsby, 957 S.W.2d 541, 546 (Tenn. Crim. App. 1997); Boston, 938 S.W.2d at 438; State v.Staten, 787 S.W.2d 934, 936 (Tenn. Crim. App. 1989). Thus, while Tenn. Code Ann. § 40-36-106(a) (1998 Supp.) does not require eligibility for probation, section 40-36-106(c) (1998 Supp.) does.

As stated earlier, Tenn. Code Ann. § 40-35-303(a) (1997) expressly states that a defendant shall be eligible for probation if the sentence imposed is eight (8) years or less. The trial court imposed a ten-year sentence. Therefore, the appellant is not eligible for probation and, likewise, is not eligible for sentencing under Tenn. Code Ann. § 40-36-106(c) (1998 Supp.). This issue is without merit.

Accordingly, the judgment of the trial court is affirmed.

_____

Norma McGee Ogle, Judge

CONCUR:

_____

Jerry L. Smith, Judge

_____

Joe G. Riley, Judge